Rachel Lynn BELL, a minor, by Mrs. Odessa K. Bell, her mother and next friend, et al.

v.

**SCHOOL CITY OF GARY, INDIANA.**

Civ. No. 3346.

United States District Court
N. D. Indiana,
Hammond Division.

Jan. 29, 1963.

F. Laurence Anderson, Jr., Hilbert L. Bradley, Gary, Ind., Richard G. Hatcher, East Chicago, Ind., Charles Wills, South Bend, Ind., Robert L. Carter, Barbara A. Morris, New York City, for plaintiffs.

Orval W. Anderson, Albert H. Gavit, Gary, Ind., Edmond J. Leeney, Hammond, Ind., for defendant.

impairment not of itself disabling, is equivalent to a disability as defined by the Act. Cf., Bower v. Celebrezze, supra.

BEAMER, District Judge.

This is a declaratory judgment action brought by approximately 100 minor Negro children, enrolled in the public schools in Gary, Indiana. The action is brought by and on behalf of the plaintiffs and all others who are similarly situated, against the School City of Gary, Gary, Indiana.

The plaintiffs present three principal questions which they ask the Court to determine:

1. Whether the defendant, by assigning plaintiffs and the other members of the class to certain schools, by creating attendance zones, by controlling transfers from school to school, by controlling assignments from elementary to secondary schools and by the pattern of building new schools and enlarging others, maintain the Gary schools as a racially segregated school system in violation of the plaintiffs constitutional rights.

2. Whether the defendant is discriminating against the plaintiffs and the class they represent by providing inferior facilities in all respects, including but not limited to overcrowded and larger classes and unequal recreational and extra curricular facilities in violation of their constitutional rights, and

3. Whether the plaintiffs and other members of the class have a constitutional right to attend racially integrated schools and the defendant has a constitutional duty to provide and maintain a racially integrated school system.

The evidence shows that Gary, Indiana is a rapidly growing industrial city located in the northwest portion of Indiana. Geographically it is shaped much like the capital letter "T". Its north boundary line is the southern shore of Lake Michigan. The stem of the "T" extends approximately seven miles from near the shore of Lake Michigan to the southern boundary of the city and is approximately two miles wide. The crossbar of the "T" is approximately four miles wide and extends east and west a distance of approximately ten and one-half miles. Steel mills and other heavy industrial establishments are located primarily along the shore of the lake. The remainder of the territory is devoted to commercial and residential areas although some industry is located near the east and west portions of the crossbar of the "T".

The population of Gary, according to the United States Census, in 1950 was 133,911 which included 39,326 Negroes. In 1960, the population was 178,320, of which 69,340 were Negroes, The student population in the public schools for the 1951–52 school year was 22,770, of which 8,406 or approximately 37% were Negroes. In the 1961–62 school year there were 43,090 students in the public school system and 23,055 or approximately 53% were Negroes.

In 1951, the Gary School City maintained 20 school buildings. In 1961, the number of buildings had increased to 40. Additional schools had either been completed or were in the process of completion at the time of the trial of this case.

In the school year 1961–62, 10,710 of the students enrolled in the Gary school system attended fourteen schools which were 100% white; 16,242 students attended twelve schools which were populated from 99 to 100 per cent by Negroes; 6,981 students attended five schools which were from 77 to 95 per cent Negroes; 4,066 attended four schools which had a range from 13 to 37 per cent Negro; 5,465 attended five schools which had a Negro population from one to five per cent.

The schools in operation in the 1951–52 and 1961–62 school years, their total enrollment and percentage of Negro students are shown on the following chart.

TABLE SHOWING COMPARISON OF NEGRO AND WHITE YOUTH EN-
ROLLED * IN GARY PUBLIC SCHOOLS YEAR 1951 and YEAR 1961

| Schools | 1951 — 1952 | | | 1961 — 1962 | | |
|---|---|---|---|---|---|---|
| | Total Enroll-ment | No. of Negroes | % | Total Enroll-ment | No. of Negroes | % |
| AETNA | — | — | – | 1,095 | — | – |
| AMBRIDGE | 190 | — | – | 350 | — | – |
| BANNEKER | — | — | – | 877 | 876 | 99. |
| BETHUNE | — | — | – | 1,011 | 1,001 | 99.01 |
| BEVERIDGE | 465 | 69 | 14.8 | 470 | 392 | 83.4 |
| BRUNSWICK | — | — | – | 1,039 | — | – |
| CARVER | 893 | 893 | 100 | 1,196 | 1,196 | 100 |
| CHASE | — | — | – | 467 | 171 | 36.8 |
| DOUGLASS | — | — | – | 1,051 | 1,050 | 99.9 |
| DREW | — | — | – | 978 | 974 | 99.59 |
| DUNBAR | — | — | – | 1,343 | 1,342 | 99.92 |
| EDISON | 1,339 | — | – | 1,358 | 27 | 1.9 |
| EMERSON | 1,896 | 179 | 9.44 | 2,184 | 276 | 12.64 |
| FRANKLIN | 482 | — | – | 756 | — | – |
| FROEBEL | 2,260 | 1,266 | 56 | 2,109 | 2,004 | 95 |
| GARNETT | — | — | – | 1,272 | 1,272 | 100 |
| GLEN PARK | 474 | — | – | 293 | — | – |
| IVANHOE | 108 | — | – | 678 | 89 | 13.12 |
| JEFFERSON | 701 | 8 | 1.14 | 773 | 35 | 4.9 |
| KUNY | — | — | – | 375 | — | – |
| LINCOLN | 754 | 744 | 98.67 | 1,418 | 1,413 | 99.64 |
| LOCKE | — | — | – | 1,094 | 1,093 | 99.9 |
| MANN | 2,115 | — | – | 1,602 | 1 | .99 |
| MARQUETTE | — | — | – | 707 | — | – |
| MELTON | — | — | – | 701 | — | – |
| MILLER | 212 | — | – | 196 | — | – |
| NOBEL | — | — | – | 626 | — | – |
| NORTON | — | — | – | 1,660 | 1,466 | 88.31 |
| PITTMAN SQUARE | — | — | – | 507 | — | – |
| PULASKI | 1,671 | 1,646 | 98.52 | 1,719 | 1,714 | 99.7 |
| PYLE | — | — | – | 868 | 836 | 96.3 |
| RILEY | 313 | — | – | 725 | — | – |
| ROOSEVELT | 3,676 | 3,676 | 100 | 3,202 | 3,200 | 99.00 |
| TOLLESTON | 1,698 | 74 | 4.3 | 1,898 | 1,455 | 76.65 |
| VOHR | — | — | – | 801 | 11 | 1.37 |
| WALLACE | 2,384 | — | – | 2,726 | — | – |
| WASHINGTON | 344 | 30 | 8.72 | 676 | 162 | 23.96 |
| WEBSTER | — | — | – | 547 | — | – |
| WILLIAMS | — | — | – | 881 | 881 | 100 |
| WIRT | 795 | — | – | 1,034 | 2 | 1.9 |
| SPECIAL SCHOOLS: | | | | | | |
| DUNELAND | — | — | – | 74 | 35 | 47.29 |
| LUTHERAN CHURCH | — | — | – | 62 | 45 | 72.58 |
| NORTON PARK | — | — | – | 45 | 34 | 77.3 |
| TEENETTES | — | — | – | 9 | 2 | 2.2 |
| TOTAL | 22,770 | 8,406 | 36.5 | 43,090 | 23,055 | 53.5 |

* Some years estimated because no records made.

The Negro population in Gary is concentrated in what is generally called the "Central District" which occupies roughly the south half of the cross-bar of the "T" from east to west and is bounded on the north by the Wabash Railroad and on the south by the city limits and the Little Calumet River. The expansion of the Negro population within the Gary city limits has been largely from east to west within the Central District. Approximately 70,000 Negroes including the 23,000 Negro school children live in this District which comprises about one-third of the area of the city.

Gary, which is a relatively new city having been organized in 1906, developed a rather unique school system commonly known as the Wirt System, so named after the superintendent of schools who was its architect. It was originally laid out in eight school districts and, as the school population demanded, one large school was built in each of the eight districts. Each of these schools handled the education of the public school population within its area, from kindergarten through high school. The original eight schools comprising this system were Edison, Tolleston, Mann, Froebel, Roosevelt, Wallace, Emerson and Wirt. Only Emerson remains a kindergarten through twelve school.

As the school population expanded, additional elementary schools were built. These were generally schools serving children from kindergarten through the sixth grade. Some of these elementary schools serve students from only one of the original eight districts and others accommodate elementary students from two or three such districts.

As these elementary schools were built, attendance zones were drawn for them and as the students complete the course in the elementary school to which they are assigned, they then go on to the high school in the district in which they reside for the completion of their public school education.

When some of the original kindergarten through twelve schools could no longer handle the school population above the sixth grade, junior high schools were built to relieve the pressure. The Pulaski Junior High School was the original junior high building and it houses seventh, eighth and ninth grade students from portions of the Roosevelt, Froebel and Emerson districts. The Beckman Junior High School building, just now being completed, will handle sixth, seventh and eighth grade students from a portion of the Roosevelt district and Bailly, also in the process of construction, will handle seventh and eighth grade students from the Wallace district.

Prior to 1949, Gary had segregated schools in what is commonly known as the Pulaski Complex. Two schools were built on the same campus, one was called Pulaski-East and the other Pulaski-West. One was occupied by Negro students and the other by white students. This was in accordance with the separate but equal policy, then permitted by Indiana law, (Burns Indiana Statutes Annotated, 1948 Replacement, Section 28–5104.) In 1949, Indiana repealed the separate but equal law and passed a new act expressly prohibiting segregated schools on the basis of race, color or creed, (Burns Indiana Statutes Annotated, 1948 Replacement, Pocket Supplement, § 28–5158). Complying with the mandate of the Indiana Legislature, the Gary School Board abolished the segregated schools in the Pulaski Complex and integrated the two schools. Prior to this time, however, the races were mixed in some of the other schools in the Gary system.

It is the contention of the plaintiffs that the defendant, by the manner in which it has drawn its school district boundaries, has purposely and intentionally maintained a segregated school system thereby depriving a majority of the Negro students in Gary from attending schools with white students. The Board, on the other hand, specifically denies that there has been any intentional segregation of the races in the Gary school system. As a matter of fact, the School Board and its staff insists that they are color blind, so far as the races are concerned, in the administration of the Gary

school system. They maintain no records on the basis of race or color and had to secure the information as to the number of Negroes attending the various schools from sources other than records kept by the school administration for the purpose of obtaining racial figures for the trial of this case.

There can be no doubt that those in charge of administration of the Gary schools have had a serious problem, during the past decade or so, in maintaining facilities for the rapidly expanding school population. During the past ten years twenty-two new schools or additions have been built and the class rooms have been more than doubled. In Indiana a school corporation is limited in its bonding power to two per cent of the assessed valuation of the property in the district. The Gary School City has been bonded to its limits for the purpose of providing facilities for the past several years. In addition, they have provided, through taxation, an accumulated building fund for the purpose of aiding in the construction of facilities for their ever expanding student population. For the year 1962, payable in 1963, the property tax rate for the School City of Gary is $5.85 per $100.00 of assessed valuation, which is either the highest or one of the highest in the state of Indiana.

In spite of the tremendous effort made by the Board of Trustees and the school administration, they have not always been able to keep their students adequately and properly housed. In addition to adding school buildings they have rented churches, store rooms, and utilized other public buildings, such as armories and park buildings, for the purpose of providing class rooms for children. It has also been necessary to operate some of the schools on a two shift basis. Roosevelt, a predominantly Negro school, for example, operates now as a senior high school in the morning and as a junior high school in the afternoon. Wallace, an all white school, is operated the same way. This condition will be relieved in the very near future when the new Beckman and Bailly Junior High buildings will be occupied for the first time. Twenty-eight classes in the Drew Elementary School are also operated on a two shift basis. This situation will also be eliminated when the new junior high school buildings are occupied.

The boundary lines of the original kindergarten through twelve schools have remained unchanged for the most part since they were originally established. In 1953, there was a change in the line between the Emerson and Roosevelt Districts from 20th Avenue to 19th Avenue which affected the students from grades seven through twelve who lived in the area affected by the boundary change. The plaintiffs contend that this shift was made in order to put all of the students in these grades from the Dorrie Miller housing project, which is occupied by Negroes, in the Roosevelt School, a predominantly Negro school, rather than the Emerson School which is a predominantly white school, for the purpose of segregating the races. The defendant, on the other hand, claims there were no racial considerations involved in this change. The change was made on August 26, 1953 after a careful study had been made by the school boundary committee. The report of the Boundary Committee reads as follows:

"Introduction:

"The School Boundary Committee at their meeting, August 26, 1953, recommended that the south line of the Emerson School Boundary, grades 7 to 12, be changed from 20th Avenue to 19th Avenue. That is, to change to a line running East and West along 19th Avenue from Virginia Street to the City Limits.

"A. Reasons for Change:

"1. Because of the completion of the Dorrie Miller Project, it was necessary to redefine this Emerson Boundary Line. The present line (20th Avenue) divides the Project Area in half. Also, 20th Avenue is not marked when it reaches the Project Area. It is not considered good for children

of a closely knit community, such as the Project, to attend different schools.

"2. Another consideration faced by the committee was the fact that in the Pulaski Area, and in Aetna, some 1200 new homes have been built or will soon be completed. On the average, each home represents slightly over one grade school child. So these facts had to be evaluated carefully in shifting this school boundary.

"B. Effect on Emerson and Roosevelt:

"1. As a result of this boundary change, there will be less than ten children shifted from one school to the other at the present time. This is because:

"a. Over 90% of the families moving into this area have children less than twelve years old.

"b. Students already enrolled in the 7–12th grade level are permitted to remain.

"2. It will be from three to to five years before there may be any increase of enrollment either at Emerson or Roosevelt at the 7–12th grade level because of the younger families in the area, as well as the fact that Pulaski plans to enlarge its grade capacity to include the 7th and 8th.

"C. Other Possibilities Considered:

"1. One suggestion considered was to move the boundary line from 20th Avenue to 15th Avenue. However, consideration of the capacity of the schools, distance of travel of the students, indicated that this was not feasible.

"2. Another suggestion was to keep the line at 20th Avenue, until it reaches Ohio Street, and then North on Ohio to 19th Avenue, and then East to the City Limits.

"Again at this time only about six 7th graders would be affected by this move. Just south of Pulaski School, between 19th and 20th Avenues, there are 176 new family units. It will be four years until many of this group are in High School.

"The majority of the committee members believed that there was an advantage of making boundaries along straight lines. Since the 19th Avenue line would be the line on one side of Ohio Street, they believed it could just as well extend over to Virginia.

'D. General Considerations:

"The committee believed that this should be considered as a temporary boundary line for this year. More facts about the movement of population into these areas will have to be obtained before making long range plans. The development of Pulaski School will also affect any future recommendations."

There was also testimony at the trial that plans were then under way for the construction of a new junior high school on the Roosevelt campus which comprises a large area and permitted the construction of additional facilities on the site in accordance with the requirements of the State Department of Education, whereas the Emerson land area was much smaller and would not permit the expansion of the facilities in accordance with the requirements of the State because of the lack of sufficient ground.

The plaintiffs only other serious contention that redistricting was done for the purpose of maintaining Negro students in a school separate from white students was in the Washington Elementary School district. The Washington School district was originally a rectangular area approximately fifteen blocks east and west by eighteen blocks north and south. The Washington School building was located in the northwest quarter of this section. When the school population in the area became too great to be accommodated in the Washington School be-

cause of new housing in the southern portion of the district, the Locke School was constructed and was located in what was roughly the southeast quarter of the district, approximately eight blocks south and three blocks east of the Washington School. After the Locke School was built, the former Washington School district was divided into two districts by dividing the area at 19th Avenue which required all of the students south of the avenue to go to the Locke School and all of the students north of the avenue to continue to go to Washington. As a result, Locke, in the 1961–1962 school year, was populated by 99 per cent Negro students whereas Washington School had a Negro population of twenty-four per cent. Plaintiffs contend that by drawing the boundary of the new districts north and south along Whitcomb Street that the percentage of Negroes at both schools would have been approximately equal. The defendant, however, contends that drawing the boundary line as suggested would require students in the two districts to travel a much greater distance to get to school and that students living in the southernmost portion of the district near Whitcomb Street would have to travel fourteen or fifteen blocks to school and go directly past the Locke School which is located approximately three blocks from their homes. Likewise, students living in the northern part of the Washington district near Whitcomb Street would travel approximately the same distance to Locke School and in order to get there would have to go within two blocks of the Washington School which, at most, would be five blocks from their homes. The defendant contends that there was no racial consideration in the location of the schools and the only consideration in the location of the Locke School was the availability of land in the areas which would best serve the students within the area. At the time Washington School was constructed there were no racial considerations involved.

With the two exceptions mentioned above, there is no serious contention on the part of the plaintiffs that the boundary lines of the various school districts were especially drawn for the purpose of segregating the races in the public schools.

The Board of School Trustees is a bipartisan Board consisting of five members appointed by the Mayor for staggered four year terms. The Board elects its own officers. Dr. Leroy W. Bingham, a Negro, is now the Board's President. He testified that it was the policy of the Board to construct and to enlarge school buildings where they are needed for the purpose of serving students in the area, whether that area be populated by Negroes or whites, or by both races. He also testified that there was no policy of segregation of races in the Gary school system; that beginning with the school year 1961 the Board adopted a policy of total integration of its staff from the administrative level on down. He also stated that in order to alleviate congestion in the more heavily populated areas, the Board adopted a policy of transferring students from several congested areas to less congested areas in order to try to balance the loads in the various buildings. He also testified that this was done without any consideration of race whatsoever, but for the purpose of relieving congestion wherever possible and using every building to its total capacity; that the policy of the Board was to make complete use of the facilities available for the benefit of all of the children in the school system without regard to race so that all students could be afforded the best education possible.

Mr. Samuel Moise, immediate past president of the Board, also testified to the same effect and it was stipulatd by counsel that the other three members, if called to testify, would substantiate the testimony given by Dr. Bingham and Mr. Moise.

Relative to the integration of the staff, a Negro occupies the position of Assistant Superintendent of Schools in charge of the Bureau of Research and Publication. He is one of three assistant super-

intendents, all of whom have equal rank. The Coordinator of Secondary Education is also a Negro as is the Supervisor of Special Education, the Mathematics Consultant in charge of the Mathematics program in secondary education, a coordinator in the Food Services Department, elementary supervisor and a member of the Special Services Department who devotes a large part of his work to the problem of proper boundary lines for attendance areas. There are 18 Negro principals and 38 white principals.[1] The teaching staff consists of 798½ Negro teachers, 833½ white teachers[2] and 3 orientals. All schools with the exception of one small elementary school have at least one Negro teacher on the staff. All but five of the forty-two schools have at least one white teacher.

As a result of the policy of transferring students from overcrowded schools to less crowded schools, 123 children, 92 of whom are Negroes, have been transferred from Tolleston, a predominantly Negro School to Mann, a predominantly white school. Eighty-seven Negro students have been transferred from Tolleston to Edison, a predominantly white school. One hundred and forty students, 120 of whom are Negroes have been transferred from Froebel, a predominantly Negro School to Chase, a predominantly white school. In most, if not all instances, the transferred students are transported by bus at a cost of $20.00 a day per bus load and because of the cost and other factors the Board hopes to utilize facilities within walking distance to the schools as soon as possible. It was stated that this transfer policy, now in effect, is intended to be temporary and was instituted to alleviate overcrowded conditions wherever possible and was not done because of any racial considerations.

The transfer of students generally, from one school to another, is handled on an individual basis. There is no transfer as a matter of right from one school district to another, but on the application of an individual student or his parent, the reason for the transfer request is considered and is allowed or denied depending upon the apparent reasonableness and desirability of the transfer and no racial factors are considered in allowing or disallowing a transfer.

From time to time protests have been made to the School Board by Negro groups concerning the construction of contemplated buildings on the ground that the planned location would create a racial imbalance in the school. The evidence indicates that consideration was given to all of these protests and that on one or more occasion the construction of schools already planned for a certain location was held up or cancelled because of these protests.

■■ From a consideration of all the evidence and the record, the Court can not see that the Board of Education has deliberately or purposely segregated the Gary schools according to race. In the Court's opinion the plaintiffs have failed to sustain their burden of showing that the School Board has so drawn the boundary lines of the school districts within the Gary School system so as to contain the Negroes in certain districts and the whites in others. The only real attempt by the plaintiffs to show such action on the part of the School Board was in connection with the Washington-Locke district as a result of the construction of the new Locke School and in the Roosevelt-Emerson districts in changing the boundary lines from 19th to 20th Avenue. In the Court's opinion there were compelling reasons for districting these two areas in the manner in which it was accomplished, aside from any racial consideration and the Court cannot presume that the Board acted in bad faith. Furthermore, the evidence shows that Negro students were attending both the Emerson School and the Washington School at the time this redistricting was done.

---

1. Assistant principals are included in these figures.

2. The ½ teacher refers to teachers who work one-half time.

An examination of the school boundary lines in the light of the various factors involved such as density of population, distances that the students have to travel and the safety of the children, particularly in the lower grades, indicates that the areas have been reasonably arrived at and that the lines have not been drawn for the purpose of including or excluding children of certain races.

The safety factors are difficult to solve in this school system. Three U. S. Highways and the Indiana Toll Road traverse Gary from East to West. At least nine railroads cross the city, mostly at grade, as they converge on Chicago from the east or southeast. Some of these railroads have multiple tracks through the city and the streets crossing them are several blocks apart in some areas. The Little Calumet River crosses the city from east to west and is infrequently bridged. These are all safety factors that have to be considered in locating schools and fixing attendance districts.

The evidence shows that the Board has consistently followed the general policy of requiring the students to attend the school designated to serve the district in which they live regardless of race. This is clearly demonstrated by the attendance figures in the 1951–52 and 1961–62 school years in certain school districts. The Tolleston School, for example, in 1951–52 had 1,698 students, 74 or 4.3% of whom were Negroes. With no change in the school boundary lines in 1961–62 the school had 1,898 students and 1,455 or 76.65% were Negroes. Another example is the Froebel School which, in the 1951–52 school year had an enrollment of 2,260 students and 1,266 or 56% were Negro. In the 1961–62 school year the same school, with the same boundary lines, had 2,109 students and 2,004 or 95% were Negro. Beveridge Elementary School in 1951–52 had 465 students, 69 or 14.8% of whom were Negroes. In 1961–62 Beveridge had an enrollment of 470 students and 392 or 83% were Negro.

The problem in Gary is not one of segregated schools but rather one of segregated housing. Either by choice or design, the Negro population of Gary is concentrated in the so-called central area, and as a result the schools in that area are populated by Negro students. If the Negro population was proportionately scattered throughout the city, the racial percentages within the schools would be in relative proportion of Negroes to whites.

■ The plaintiffs attempted to prove that students attending predominantly Negro Schools are discriminated against because of inferior instruction, inferior curriculum and overcrowded conditions but the evidence was unimpressive.

The evidence as to inferior instruction consisted of figures showing more non-tenure teachers with lower pay in some of the predominantly Negro schools, and the results of certain achievement tests disclosing a lower standard of achievement by the students in some of these schools than by the students attending some of the predominantly white schools.

A tenure teacher in Indiana is one who has taught in a school system for at least five years. After that time he attains certain employment security which protects him from discharge, except for cause. Tenure status has nothing to do with his skill or ability as a teacher, except that his employment for the sixth year probably indicates that his first five years of service were satisfactory, otherwise he would not be retained. Since the greatest expansion of students and staff in Gary has been in the schools attended predominantly by Negroes it is only natural that more new teachers would be found there. This does not mean that these teachers are inferior. The evidence shows that the same standards are used in selecting all teachers and that in all cases the administration seeks to select the very best teacher available.

Since the salary increases for the teaching staff is based on years of service in the system, the newer teachers naturally receive less compensation, but again this has nothing to do with the

teachers' ability. All teachers with the same length of service receive the same pay.

A comparison of achievement tests sheds little or no light on the quality of instruction, unless there is a corresponding showing of ability to achieve.

The only evidence of inferior curriculum was that certain elective subjects are offered in some schools and not in others. It was explained that these electives are offered on the basis of whether or not there are sufficient students interested in the course in a given school to constitute a class large enough to justify assigning an instructor.

Certain exhibits were introduced by the plaintiffs for the purpose of showing that there was overcrowding in some of the predominantly Negro schools and that the classes were larger in such schools. The defendant offered evidence to show that these exhibits were either inaccurate or misleading. In any event, the variance between class sizes in the various schools was not great. Larger classes and more crowded conditions in the Negro districts might reasonably be expected because that is the area where the greatest increase in student population has occurred in the past ten years. While the greater expansion of facilities has also been in this area, it has been difficult if not impossible, to keep up with the needs. There is no convincing evidence of any discrimination as claimed by the plaintiffs.

The plaintiffs in their briefs have relied heavily upon the case of Taylor v. Board of Education, 191 F.Supp. 181 and 2 Cir., 294 F.2d 36, to sustain their position that the School Board has deliberately segregated the Gary Schools. The facts here are entirely different than in the Taylor case. The evidence there showed that the Board had deliberately drawn the district lines of the Lincoln School for the purpose of containing most of the Negroes and excluding most of the whites. There is no such evidence in this case and in the Court's opinion the decision in Taylor does not apply because of lack of intent or purpose on the part of the defendant here to segregate the races in certain schools.

The fact that certain schools are completely or predominantly Negro does not mean that the defendant maintains a segregated school system. See Brown v. Board of Education of Topeka, 139 F.Supp. 468. There, the three judge Court, charged with the duty of implementing the decision of the Supreme Court, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, held, in passing upon the plan submitted by the school board for de-segregation of the Topeka schools, that a school is not segregated because it is attended by all Negro students if the district is inhabited entirely by Negroes and they are compelled to attend the school in the district in which they live.

The plaintiffs contend, however, that regardless of the motive or intent of the defendant, actual segregation of the races in the Gary schools exists because a large percentage of the Negro children are required to attend schools that are totally or predominantly Negro in composition, whereas, a large percentage of the white students attend schools that are totally or predominantly white. It is the position of the plaintiffs that regardless of school districts or the residence of the Negro students, or any other factors, there is an affirmative duty on the part of the defendant to integrate the races so as to bring about, as nearly as possible, a racial balance in each of the various schools in the system.

In support of their proposition, the plaintiffs cite language from the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873, to the effect that:

"To separate them (Negroes) from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

The plaintiffs concede the question which they now urge has not been passed

upon by the Supreme Court or by any other Court where the question was specifically presented. They contend however that the language above quoted from the Supreme Court in the Brown case, together with language found in certain other cases, principally Taylor v. The Board of Education, supra, and Branche v. Board of Education, 204 F.Supp. 150, indicates that it is the policy of the law that those in charge of the administration of our schools are not only prohibited from segregating the races but they also have the affirmative duty to integrate the races and see that there is racial balance maintained in the schools under their supervision.

Without reviewing the language of the cited decisions here, it must be remembered that in Taylor the Court was dealing with a situation where it found that the School Board had deliberately segregated the races in their school district and whatever the Court said there was stated in the light of the Court's mandate to de-segregate a school which was purposely segregated. In its final analysis Taylor mandated the School Board to undo what had been illegally done. In the Branche case the Court was passing upon a motion for summary judgment filed by the Board of Education. The Court's opinion was that the Board's showing on its motion for summary judgment was not sufficiently convincing and that therefore there must be a trial on the merits. Whatever language the Court used in this posture could not be decisive of the question here.

At the trial of this case the plaintiffs offered an expert, a Dr. Max Wolff, a sociology professor with no experience in public school administration, or for that matter no experience in the field of public school education.

Dr. Wolff defined a segregated school as "any school where the percentage of Negro to white students was one-third greater or one-third less than the percentage of Negro students to white students in the entire system". Applying his formula to the Gary schools he concluded that any school with less than 36% Negro students was a segregated white school and any school with more than 72% colored students was a segregated Negro school. Dr. Wolff cited no authority for his definition of segregated schools other than himself. Dr. Wolff's definition of a segregated school may be a good sociological definition, but the Court can find no authority which would indicate that it is a good legal definition. The Court is of the opinion that a simple definition of a segregated school, within the context in which we are dealing, is a school which a given student would be otherwise eligible to attend, except for his race or color, or, a school which a student is compelled to attend because of his race or color.

■ The neighborhood school which serves the students within a prescribed district is a long and well established institution in American public school education. It is almost universally used, particularly in the larger school systems. It has many social, cultural and administrative advantages which are apparent without enumeration. With the use of the neighborhood school districts in any school system with a large and expanding percentage of Negro population, it is almost inevitable that a racial imbalance will result in certain schools. Nevertheless, I have seen nothing in the many cases dealing with the segregation problem which leads me to believe that the law requires that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate the races, must be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites. On the other hand, there are many expressions to the contrary, and these expressions lead me to believe that racial balance in our public schools is not constitutionally mandated.

In its original opinion in Brown v. Board of Education, supra, the Supreme Court set the case for further argument on the question of how its decision should

be implemented. One of the questions to be re-argued was:

"4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

" '(a) would a decree necessarily follow providing that, *within the limits set by normal geographic districting*, Negro children should forthwith be admitted to schools of their choice," (emphasis added). (see footnote 2, 349 U.S. 298, 75 S.Ct. 755)

Following re-argument, the Supreme Court handed down the second decision in the Brown case, 349 U.S. 294, 75 S.Ct. 753, which was in effect its instructions to the District Courts involved as to how its policy of de-segregation should be carried out.

In instructing the District Courts, the Court said in part:

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954 ruling. * * To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, *revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a non-racial basis, * * * ".* (Emphasis added)

These instructions clearly indicate that the Supreme Court intended that the de-segregation policy was to be carried out within the framework of "school districts and attendance areas". In carrying out the instructions of the Supreme Court, the three-judge District Court in the District of Kansas said in Brown v. Board of Education, 139 F.Supp. 468:

"It was stressed at the hearing that such schools as Buchanan are all-colored schools and that in them there is no intermingling of colored and white children. Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color.

"If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live."

By this expression the District Court clearly indicated that even in a school system that had been segregated and where the burden was on the Board to show that their desegregation plan eliminated racial segregation as such, there could still be all colored schools if all of the students living in a properly constituted school district were Negroes, and that no constitutional rights were violated because students were compelled to attend the school in the district in which they lived.

In the recent case of Evans v. Buchanan, 207 F.Supp. 820, the Court said:

"The court holds that the States do not have an affirmative, constitutional duty to provide an integrated education. The pertinent portion of the Fourteenth Amendment of the United States Constitution reads, 'nor [shall any State] deny any person within its jurisdiction the equal protection of the laws.' This clause does not contemplate compelling action; rather, it is a prohibition preventing the States from applying their laws unequally.

"When interpreting the equal protection clause in the Brown case the Supreme Court held only that a State may not deny any person on account of race the right to attend a public school. Chief Justice Warren, speaking for the court said, 'To separate them [Negroes] from others * * * *solely* because of their

race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.' (Emphasis supplied.) The clear implication of this statement is that if races are separated because of geographic or transportation considerations or other similar criteria, it is no concern of the Federal Constitution. Thus, discrimination is forbidden but integration is not compelled."

The Court finds no support for the plaintiffs position that the defendant has an affirmative duty to balance the races in the various schools under its jurisdiction, regardless of the residence of students involved. Indeed, their own evidence is that such a task could not be accomplished in the Gary schools. Their expert, Dr. Wolff, submitted a proposal for balancing the races in most of the schools by eliminating four of the eight high schools now existing and building three new high schools and by transferring approximately 6,000 students from their neighborhood school to other schools, some of them great distances away. Even if his plan were adopted, Roosevelt School would still be 100% Negro and Bailly, by his definition, would continue to be a segregated white school. In developing his plan, Dr. Wolff, in effect, admitted that he considered only the desirability of creating a racial balance in the schools and that costs, safety factors and other considerations were at least secondary to his main objective.

Unfortunately, the problems confronting the school administration are not as simple as Dr. Wolff's solution. For example, the financial burden of transporting 6,000 students from their home neighborhood to another would be a matter of considerable concern to the administrators of an already heavily taxed and indebted school district. Moreover, the administrative problem of choosing those who would be transferred and those who would not in a rapidly growing school system where the racial complexion of the various neighborhoods is constantly changing would be almost impossible to solve.

Furthermore, requiring certain students to leave their neighborhood and friends and be transferred to another school miles away, while other students, similarly situated, remained in the neighborhood school, simply for the purpose of balancing the races in the various schools would in my opinion be indeed a violation of the equal protection clause of the Fourteenth Amendment.

For reasons stated herein, the Court finds no violation by the defendant of the plaintiffs' constitutional rights.

Defendant's counsel will submit Findings of Fact, Conclusions of Law and Order consistent with this Opinion on or before February 11, 1963.