Mrs. Precious **GRIGGS** et al., Plaintiffs,

v.

Ed S. **COOK** et al., Defendants.

Civ. A. No. 10841.

United States District Court
N. D. Georgia,
Atlanta Division.

July 21, 1967.

164

Howard Moore, Jr., Atlanta, Ga., for plaintiffs.

A. C. Latimer, J. Lee Perry, Thomas K. McWhorter, Atlanta, Ga., for defendants.

SIDNEY O. SMITH, Jr., District Judge.

This is a suit which arose when the plaintiff property owners for themselves and on behalf of negro parents of school age children in the City of Atlanta raised multiple objections to the location of a proposed new school, terms for planning purposes as the "Central Replacement" School by the defendants, primarily the Atlanta "Board of Education." Concurrently with the filing of this suit for injunction, the plaintiffs sought to "remove" the state condemnation proceedings against the property in question as a companion case in district court. The issues involved there plus certain collateral complaints here were disposed of by prior ruling on motions to remand and dismiss. As the result of such rulings, the matter came on for trial on the limited issue of whether the location of this school violates that portion of the decree of the Fifth Circuit

Court of Appeals in United States v. Jefferson County Board of Education, 380 F.2d 385 (en banc March 29, 1967) which provides:

> "The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system."

All parties stipulated that there was no requirement for a three-judge court under 28 U.S.C.A. § 2281 ff. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

The case was tried extensively before the court and at the request of counsel a brief order denying the injunction was entered on June 30, 1967, with the understanding that a supplemental opinion be filed in accordance with Rule 52.

Based on the evidence presented, the court makes the following

## FINDINGS OF FACT

The plaintiffs and numerous members of the class they represent reside in a predominantly all negro area, specified as the "Nash-Bans Area" by federal and local planning agencies. (See P Ex. #1 and D Ex. #1). This area is highly congested, over-populated, and contains many sub-standard housing units. The population estimates for the area are some 45,000 negroes and an insignificant few hundred whites. It is the approximate center of a vast negro residential band which extends for about a two mile width across the center from east to west on both sides of the downtown business area of the City of Atlanta (See Court's Ex. #C).

The negro school children in this area are presently served by the Craddock School, the English Avenue School, and nearby the Washington High School. Washington High is a very popular school among negro students throughout the city and excessive demands have been made on its facilities. Likewise the existing elementary schools serving the area are over-taxed. As a result, pupils of junior high age have been siphoned off and presently attend the Central Junior High, located southwest of the area near the State Capitol-City Hall center, in a heavy business and commercial district.

All parties agree that the Central Junior High is sub-standard, not conveniently located, and generally unsuitable. Upon completion of the present project, it will be abandoned. Likewise, all parties agree that the negro pupils in the Nash-Bans area need to be served in some convenient manner.

To relieve the problem, an addition is being made to the English Avenue School located in the northern part of the area and the present project is contemplated for the southern part of the area. It will initially contain junior high grades (and eventually elementary grades) in the continuing effort to relieve Washington High, where the bulk of the area's students eventually attend High School. Because of this function, it is tentatively identified as the Central Junior Replacement or simply Central Replacement with an initial capacity of 1,000–1,200 students.

New schools for the area in question have been demanded for some time and publicity and planning leading to previous school bond elections referred to the need for a "Vine City" school. Vine City may be described as the southwest quarter of the Nash-Bans area, bounded by Northside Drive (a main thoroughfare), Simpson, Hunter, and Sunset Streets. (See red line P Ex. #1 and blue line D Ex. #1). Economically and residentially it is the poorest and most sub-standard of the Nash-Bans area and is frequently referred to as a negro ghetto, not without just cause. As counsel euphemistically states "Vine City is a state of mind."

Opponents of the present project objected to the present location on the grounds that it is not technically in the Vine City area. When the present site was selected in August, 1966, all of the initial objections were made on this basis. At various formal and informal discussions between negro leaders, residents of the community affected, and the school

board, the primary complaint was that the school was not located in Vine City as "promised" by the bond issue.[1] In fact, at trial this was still the chief complaint of the majority of plaintiff's witnesses.[2]

During the fall of 1966 and the winter of 1967, various alternate sites were proposed to the board, all of which were in Vine City proper. The present site is located only one block west of Sunset Street and within five to ten blocks of all the proposed alternates. (See D Ex. #1, Site A compared with B, C, D, & E).

The alternates were all rejected by the board in favor of the present site. Without detailing all of the factors underlying this decision, they constituted accepted normal considerations in professional school planning. Primarily responsible to the Board was the assistant superintendent in charge of school site and plant planning, who holds a master's and doctor's degree in that limited field. The decision followed many hours of study between April, 1966, and August, 1966, involving a determination of the desire and need for a school, grade and program requirements, with the pupils involved as determined by attendance spot maps coordination with street, parks, planning, zoning, and urban renewal departments working on other projects in the area, plus the more pragmatic consideration of accessibility, shape, size, safety, traffic, soil, drainage, cost, etc. In short, the factors considered all fall within the accepted standards of "economy, convenience, and education." Likewise, the rejection of alternate proposals within and without the Nash-Bans area appear to be based on accepted standards such as a desire to stay away from industrial development, heavy traffic, existing schools, etc.

Regardless of the factors used, the result will undoubtedly produce a predominantly all-negro school. Admittedly, future enrollment cannot be predicted with absolute certainty. However, the population density of the Nash-Bans area and the racial housing pattern in Atlanta will in all likelihood produce an all negro enrollment. While a few whites, residing just outside Nash-Bans, attend the English Avenue school, it is apparent here that population distribution will produce nothing more than a remote possibility of token white enrollment in the future, and it may be accepted as a fact that, at best, the new school will be predominantly negro or in excess of 98%. However, the identical situation exists as to all proposed alternates. In the opinion of the plaintiff's own witnesses, a predominantly negro school will result in any location chosen up to a distance of as much as two miles, which in a large city constitutes a considerable hardship for attendance. This arises because Atlanta is now, in the words of plaintiff's sociologist witness, a "de facto" town instead of a "de jure" town. Thus, all sites considered and proposed for this facility would be predominantly negro because of the racial housing pattern existing in the City.

The Atlanta City School System is a so-called "independent" system in that it operates independently of the school sys-

1. See D Ex. #2, 3 & 4. The school funds designated for this project were secured from the 1965 bond issue which was for unspecified school projects. Thus, there is no technical legal question about misapplication of the funds as in a specific bond issue.

2. In spite of the court's repeated ruling that this was a political consideration and neither strengthened nor weakened the legality of the present location. Similarly, it developed on trial that the City had made application with federal officials of the Neighborhood Facilities Program, Housing and Urban Development, to have this project considered as part of a community center, providing health, recreational, and educational opportunities for all ages, on the site in question. At trial, the application had neither been approved or disapproved. In the court's view, the location receives neither support nor objection, though some was voiced, from this possibility. Likewise, esthetic dispute over proposed architecture or cost has no standing on the legal question at hand. All such decisions happily are vested in some body other than the District Courts.

tem of Fulton County in which it is located. It is one of some 36 such systems left in the larger cities and towns of Georgia as a vestige of the days when strong local systems antedated the entire state school system. The Atlanta system continues to be strong. Traditionally it is at the top of the state in pay scale, curriculum development and quality education. Like all urban functions, it is in need of money, particularly capital funds. In recent years, it has been able to obtain only 21 million dollars against an estimated need of 60 million dollars for new physical facilities. Thus, few schools have ideal physical plants. The system has been allotted approximately 8 million dollars by the federal government for operating funds in the public schools.

In 1965–66, 114,238 students were enrolled in this system. In 1960–61, negro pupils constituted 45%; in 1965–66 53.7%; and in 1966–67 57%. Some 9,000 negro students now attend previously all-white schools. The dual school system was officially abandoned in 1961–62. Its original school desegregation suit was one of the few major school suits unappealed by a large southern city. It adopted the "freedom of choice" plan at all grade levels, approved throughout this circuit, well before the advent of HEW guidelines and prior to the court determined schedule. Its "commendable effort to effect desegregation" was recognized by the Supreme Court. Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288 (1964). Since that time, it has made many deliberate and positive attempts to locate schools which would automatically have substantial integration. It has consciously abandoned several schools because they were all-negro. In some instances there are currently schools with 10%–90% negro attendance. In many others, the schools remain over 95% white or negro and some 100%. According to plaintiff's evidence "in those instances where there was a chance for significant desegregation, the schools usually resegregate within approximately two years." According to defendant's evidence, when a school reaches the "tipping point" of 35% negro enrollment, there is danger of complete resegregation. Several of the Board's best efforts in mixed neighborhoods have ended in such frustrative resegregation. The freedom of choice plan has produced the startling phenomenon of negro students by-passing closer white and negro schools to attend a "prestige" negro school; and white students by-passing closer white and negro schools to attend a "prestige" white school.

Unlike many major American cities, no public transportation is provided for any student in the Atlanta system, thus there is no use of bussing either to promote integration or to preserve segregation. No other independent system in Georgia is known to provide funds for public transportation. Based on information furnished by each principal as to residential data and school hours, the private Atlanta Transit System arranges routes to accommodate many students at a reduced fare provided by each student individually; and there is no distinction between schools in this regard.

Other than historical information and inferences drawn from past statistics, which reveal the presence of all-white and all-negro schools or faculties, there is no evidence whatever that the selection of the site in question was racially motivated, and plaintiffs have not shown that the location was deliberate, wilful, or calculated to perpetuate a dual school system. To the contrary, the positive evidence is that the site selection was nonracially motivated and based on reasonable and accepted professional factors.

Motivation on the part of the plaintiffs is difficult to fathom. Not until March, 1967, after seven months of protest, was the racial question ever raised and then it was coupled with the repeated alternative of Vine City proper (See P Ex. #7). Even on depositions taken after suit was filed the named plaintiffs refuted any such racial claims in their objections to the taking of their property. With the exception of a single witness, and possibly one additional, who proposed alternative sites one to two miles distant outside the

Nash-Bans area toward the end of the trial, the testimony of plaintiffs' witnesses is unanimous that a school should be built within the general Nash-Bans area, though the racial factors are identical. Further, prohibition of *any* new school in the area is an unacceptable solution for the students living there as well as the parties involved.

## CONCLUSIONS OF LAW

■ Because of the alleged motivation of the plaintiffs in bringing this class action in federal court, the defendant moves that the action be dismissed. While the evidence renders the motives suspect, there is no known reported authority which vitiates jurisdiction on such basis. To the contrary, the indications are that a party may have standing, particularly in a class action, regardless of motivation or direct effect. See Bailey v. Patterson, 323 F.2d 201 (5th Cir. 1963); Potts v. Flax, 313 F.2d 284 (5th Cir. 1963); Singleton v. Board of Commissioners, 356 F.2d 771 (5th Cir. 1966); Wright, Federal Courts, § 72 (1963 Ed.). Here a justiciable controversy is present and the motion to dismiss on this ground is denied. Compare Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

As can be seen from the facts and as was evident at the outset of the trial, the sole question here is whether the location of a neighborhood school, *ipso facto*, is unconstitutional, because it will result in a predominantly all-negro enrollment. Short of racially motivated action in the manipulation of attendance patterns or "gerrymandering" of school districts, and prior to *Jefferson County*, the matter appeared to be at rest under such cases as Bell v. School City of Gary, 213 F.Supp. 819 (N.D.Ind.1963), aff'd 324 F.2d 209 (7th Cir. 1963), cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964) and Briggs v. Elliott, 132 F.Supp. 776 (E.D.S.C.1955); Holland v. Board of Public Instruction, 258 F.2d 730 (5th Cir. 1958); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966).

But here, the argument is made that the decree in *Jefferson County* insofar as it relates to school location renders unconstitutional any school which will result in predominantly all-negro enrollment because of the language which provides:

"The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system."

The dilemma arises from the legal application of a decree directed at *de jure* situations upon facts which plaintiffs themselves assert are *de facto* problems. It is apparent to all that the difficulty here arises out of residential racial patterns in the City of Atlanta. That such residential segregation actually produces educational segregation and renders the task of school integration extremely difficult is obvious. However, it is impossible for the court in this action to abolish the Atlanta housing problem by judicial order as desirable as such result might be in the final solution of the school problem. Such result must await effective legislation and social maturity on the part of many parties not remotely concerned with this suit.

Had the evidence shown a "bad faith" attempt on the part of defendants to locate this school in an effort to concentrate a negro enrollment, a different question would be presented. Here, however, the contrary appears and the school is being situated in the general area in which negro citizens have demanded a new school for several years. Only *the particular site* is attacked as racially intolerable. Counsel ingeniously suggests that the court consider solely the less than five acres here involved (a majority of which has already been acquired) in the hopes that negro citizens may not object to some future alternatives. As seen, the entire area is clothed with the same legal

factors, and the prospect of trying the City of Atlanta "block by block" dependent on the whims of the residents is rejected as unsound.

■ The particular location of schools, as well as curriculum, maintenance, and operation, is a matter normally vested by law in the various school boards and this district has extensively dealt with the problem in Wallis v. Blue, 263 F.Supp. 965 (N.D.Ga.1967.) (3-judge). It is only when some transcendent personal constitutional right is in-\volved that the federal courts take jurisdiction of such matters at all. Of course, racial discrimination under the constitution is such a right. But for such claim this case would be subject to dismissal. However, the inquiry is not directed to the plaintiff's property alone but to the class problem of whether any all-negro school may be located and built by school boards under the *Jefferson County* decree.

The problem here is not one of fixed assignments or tightly circumscribed attendance zones or a situation where available school-bussing could remedy an overcrowded condition as was the case recently before the district court in Washington, D. C. Hobson v. Hansen, 269 F.Supp. 401 (D.C. June, 1967). Even there, the desirability of a legitimate neighborhood school is recognized, as it apparently was in Brown v. Board of Education, 349 U.S. 294 at 300, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Nor is compulsory bussing, particularly where

no bussing at all exists, obtainable under the 1964 Civil Rights Act. United States v. Jefferson County Board of Education, supra at 79(B).

The result is that the court is faced with the square proposition of allowing a school where there is racial imbalance per se or denying the students involved any school at all within a reasonable distance.

The alternative of "no school" to "this school" is unsatisfactory and is rejected. No school at all it is submitted would constitute the greatest injustice to the pupils and people concerned.

■■ This is not a suit to pass on the legality of all the acts of the Atlanta School Board. Other operations or even other locations if selected in "bad faith" might furnish the basis for further judicial review as the process of *Brown* is a continuing one. What is decided is that the establishment of a school on non-racially motivated standards is not unconstitutional because it fortuitously results in all-negro or all-white enrollment. The need for education under reasonable conditions supersedes the need for absolute integrated education under unreasonable conditions. Such is the case here.[3]

■ It is likewise obvious that location of an all-negro school could constitute a violation of the *Jefferson County* decree under such circumstances as are alluded to in Lee v. Macon County Board of Education, 270 F.Supp. 859 (M.D.Ala. March 22, 1967, (3-Judge)), at 15(A),

---

3. A similar conclusion was recently reached when site location for public housing was attacked on the same basis. See Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N.D.Ill.1967), where the court stated: "A public housing program, conscientiously administered in accord with the statutory mandates surrounding its inception and free of any intent or purpose, however slight, to segregate the races, cannot be condemned even though it may not affirmatively achieve alterations in existing patterns of racial concentration in housing, however desirable such alterations may be. A showing of affirmative discriminatory state action is

required. * * * To accept plaintiffs' contention that allegation and proof of an intent to discriminate among the races is unnecessary is to conclude that the mere placement of public housing projects that will in all probability be occupied largely by tenants of a specific race in neighborhoods containing a significant number of residents of the same race is in itself an act of discrimination forbidden by the Fourteenth Amendment, regardless of the many other factors, imposed here by statute, such as need, cost, and rehabilitation of deteriorating neighborhoods. The Constitution compels no such conclusion; * * *."

where school location and construction was manipulated by the local and state boards to perpetuate a *de jure* dual system.

 Further, the *Jefferson County* decree controls new school location "to the extent consistent with the proper operation of the school system as a whole." Likewise Barksdale v. Springfield School Committee, 237 F.Supp. 543 (D.C.Mass. 1965) admonishes the establishment of racial concentration "within the framework of effective educational procedures." The selection of the Central Replacement site by the defendants is not only nonracially motivated, but on the facts is consistent with the proper operation of the school system and within proper educational procedures for the pupils to be served. As such, it is a proper exercise of discretion on the part of the school board.

 Since the filing of the simple order denying an injunction on June 30th, plaintiffs' counsel has submitted a request for stay pending appeal under Rule 62. There is no question about the inherent authority of the court to do so. Shinholt v. Angle, 90 F.2d 297 (5th Cir. 1937), cert. den. 302 U.S. 719, 58 S.Ct. 40, 82 L.Ed. 555 (1937).

 Here, the request for the immediate order of June 30, 1967, was to allow the defendants adequate notice to resume condemnation proceedings for the land in question or to abandon the project entirely. Because the "removal" of Civil Action No. 10,861 rendered all proceedings moot, the condemnation suit must be reinstituted. In addition, the condemnation of remaining tracts not already taken must proceed. Under such circumstances the likelihood of even a contract-letting short of several months hence is remote, much less the permanent establishment of a school on the premises. The risk is primarily on the defendants and, if reversal follows, it will probably occur in ample time to prohibit the operation of the school, to which this suit is mainly directed. In the meanwhile, the Board is entitled to planning time, and

the stay is refused. However, in the interests of expeditious appeal, all requests for delay and extension will be denied in the absence of providential cause. In any event, the question of stay ultimately rests with the Circuit Court. Harris v. Gibson, 322 F.2d 780 (5th Cir. 1963).

Accordingly, the injunction is denied and the stay pending appeal is likewise denied.

It is so ordered.