CHARLES B. BOOKER, *ET AL.*, PETITIONERS-APPELLANTS,
v. BOARD OF EDUCATION OF THE CITY OF PLAIN-
FIELD, UNION COUNTY, RESPONDENT-RESPONDENT.

Argued March 2, 1965—Decided June 28, 1965.

*Mr. Robert L. Carter*, of the New York bar, argued the cause for the appellants (*Mr. Herbert H. Tate, Mr. William Wright, Jr.*, of the New Jersey bar, and *Mr. Robert L. Carter* and *Miss Barbara A. Morris*, of the New York bar, attorneys; *Miss Joan Franklin* and *Mrs. Maria L. Marcus*, of the New York bar, of counsel).

*Mr. Victor R. King* argued the cause for the respondent.

*Mr. Alan B. Handler*, First Assistant Attorney General, argued the cause for the Commissioner of Education and State Board of Education (*Mr. Arthur J. Sills*, Attorney General of New Jersey, attorney; *Mr. Morton Anekstein*, Law Assistant, on the brief).

The opinion of the court was delivered by

JACOBS, J. The petitioners appealed under *R. R.* 4:88–8 from a decision of the State Board of Education affirming a decision of the Commissioner of Education. We certified on our own motion before argument in the Appellate Division.

After receiving protests against the racial imbalance in the Plainfield public school system, the local Board of Education appointed a lay advisory committee to review the matter and submit its report. The committee recommended that Dr. Max Wolff of New York City be retained and in April 1962 the local Board entered into an agreement which provided that Dr. Wolff, working with a team of specialists in the areas of education, sociology, psychology and zoning, would conduct a study of the racial composition of the schools and would submit findings, conclusions and suggestions by June 15, 1962.

In due time, Dr. Wolff submitted his report and recommendations to the lay advisory committee which approved, in principle, the procedure and fact-findings of the specialists team but failed to agree on recommendations and, in turn, submitted majority and minority reports of its own to the local Board.

As indicated in Dr. Wolff's report, the Negro pupil population of the elementary schools[1] in Plainfield was 37 per cent in April 1962. At that time the Negro population of the Washington School was over 95 per cent; in the other elementary schools it ranged between 0 and 65 per cent, with the Emerson, Stillman, Bryant and Lincoln schools having well over 50 per cent. Dr. Wolff submitted two plans designed to reduce racial imbalance. Plan I involved a general rezoning from north-south, instead of the then current practice of east-west; this would integrate the predominantly Negro northern area of the community with the predominantly white southern area. See Sedler, "School Segregation in the North and West: Legal Aspects," 7 *St. Louis U. L. J.* 228, 253 (1962). Plan II, which was submitted as an alternate and preferred plan, involved the pairing of six schools into three separate sets of schools in line with what has generally become known as the Princeton plan. See *Addabbo v. Donovan*, 22 *A. D. 2d* 383, 256 *N. Y. S. 2d* 178 (1965).

In July 1962 the local Board declined to adopt either of the plans submitted by Dr. Wolff and issued a statement embodying its reasons. During the same month, it announced an optional pupil registration plan for the school year commencing September 1962. Under this plan, pupils could voluntarily transfer to schools outside their residence areas provided acceptable class sizes were not exceeded and provided further that parents supplied any necessary transportation. Only 69 pupils transferred under this plan. In September 1962 the petitioners, who are children enrolled in the Plain-

[1] The high school and junior high schools in Plainfield are racially integrated and are not involved in these proceedings.

field school system and are acting through their parents or other legal representatives, filed a petition with the Commissioner of Education, protesting the local Board's refusal to adopt plans and procedures which would eliminate "racial segregation in the public schools" and "the denial of equal educational opportunities" to the petitioners and others similarly situated. An answer to the petition was duly filed and a stipulation of issues and facts was entered into in June 1963.

In the stipulation, the petitioners acknowledged that there was no issue of "intentional or deliberate segregation of elementary school pupils"; they asserted, however, that the maintenance of predominantly Negro schools engendered feelings and attitudes which tended to interfere with successful learning and tended to produce in the minds of Negro pupils "a sense of stigma and a feeling of inferiority" which had an undesirable effect upon their attitudes in education; they asserted, further, that the optional pupil registration plan did not meet or relieve the problem of racial imbalance and urged that the Commissioner approve either plan recommended by Dr. Wolff.

The stipulation set forth the local Board's position that the elementary school attendance areas in Plainfield were set up on sound educational principles and that it had no duty to alter the areas "for the sole purpose of maintaining any particular percentage of pupil distribution by color or race." It then went on to state that if the Commissioner should determine that there was racial imbalance which should be eliminated in the Plainfield schools or in any of them, then the Commissioner should approve a plan which the local Board had prepared under the designation "Sixth Grade Plan" and which it offered to put into effect by September 1963. Under this plan all sixth grades would be placed in the Washington School and "all K-5 grades in Washington School" would be transferred to other schools determined by the local Board's administrative staff on the basis of availability and utilization of classrooms; bus transportation

would be provided for all pupils who are transferred out of their original school zones irrespective of distance; and no pupils would be transferred to any school where the Negro enrollment was over 50 per cent.

No oral testimony was taken before the Commissioner who dealt with the matter on the basis of the record before him which included the petition, the answer and the stipulated issues and facts. Between the submission of Dr. Wolff's report in June 1962 and the Commissioner's decision in June 1963, the racial imbalance in some of the Plainfield schools had intensified. Thus as of April 1963, the Negro pupil population in the Washington School had risen to 96.2 per cent, in Emerson to 72.1 per cent, in Stillman to 67.6 per cent, in Bryant to 65.5 per cent and in Clinton to 58.9 per cent. The remaining elementary schools, apart from the Lincoln School which is a special school for retarded children, varied between 0.6 per cent and 44.9 per cent. The Negro pupil population in the entire elementary school system had risen to 40.4 per cent (as of April 1964 it had risen to 44.7 per cent and as of October 1964 to 47.3 per cent).

In his decision, the Commissioner first noted that there was no issue of deliberate segregation before him and that the cause of the concentration of the Negro population in particular schools was to be found in patterns of housing resulting from "a constellation of socio-economic factors." He then went on to point out that even though that be so the local Board was not thereby relieved of its responsibility to take whatever reasonable and practicable steps were available to it "to eliminate, or at least mitigate, conditions which have an adverse effect upon its pupils." Quoting from his own opinion in *Fisher v. Board of Education of the City of Orange* (decided May 15, 1963) he said:

"[T]he Commissioner is of the opinion that in the minds of Negro pupils and parents a stigma is attached to attending a school whose enrollment is completely or almost exclusively Negro, and that this sense of stigma and resulting feeling of inferiority have an undesirable effect upon attitudes related to successful learning. Reasoning from

this premise and recognizing the right of every child to equal educational opportunity, the Commissioner is convinced that in developing its pupil assignment policies and in planning for new school buildings, a board of education must take into account the continued existence or potential creation of a school populated entirely, or nearly so, by Negro pupils."

The Commissioner found from Plainfield's enrollment table that the Washington School was the only one where the enrollment was "almost entirely" Negro. He stated that he had given careful consideration to the two plans submitted by Dr. Wolff and the Sixth Grade Plan submitted by the local Board, that under each of the plans there would be no "all or nearly all" Negro school, and that "each plan is reasonable, practicable, and consistent with sound educational practice." He expressed the belief that it was the responsibility and prerogative of the local Board to determine which plan was best suited to the needs of the school system and he directed that the local Board select one of the three plans and put it into effect for the 1963-1964 school year. On the day following the Commissioner's decision the local Board put its own Sixth Grade Plan into operation.

The petitioners then appealed to the State Board of Education which heard argument in November 1963. In the meantime, and after the operation of the Sixth Grade Plan had become effective, there were shifts of Negro pupil population. As of October 1963 the Negro pupil population in Washington School was reduced to 36.6 per cent but Emerson rose from 72.1 per cent to 76.4 per cent, Bryant from 65.5 per cent to 67.1 per cent and Clinton from 58.9 per cent to 66.1 per cent. Stillman dropped somewhat from 67.6 per cent to 65.2 per cent. (As of October 1964, Bryant had risen to 78.6 per cent and Clinton had risen to 71.3 per cent whereas Emerson and Stillman had dropped insignificantly to 75.7 per cent and 65 per cent respectively.) The Jefferson School which in 1962 had a Negro pupil population of 44.9 per cent rose to 52.1 per cent in October 1963 and to 56.6 per cent in October 1964.

In affirming the Commissioner's decision, the State Board of Education stressed the Commissioner's language relating to schools which were almost entirely Negro and to his corrective action with respect to the Washington School. It took the position that the crucial question was not mathematical imbalance but whether the school fell within the Commissioner's test of "completely or almost entirely Negro"; and it concluded that within this test the Emerson, Bryant, Clinton, Stillman and Jefferson schools were free from attack. It expressed the view that racial imbalance was not to be equated with invidious segregation as condemned by the Commissioner and by the State Board itself in *Volpe v. The Board of Education of the City of Englewood* (decided September 25, 1963). It found that there had been no showing "that the 'imbalance' resulting from the adoption of the 'Sixth Grade Plan' " had deprived the Negro pupils of equal educational opportunities and that its adoption by the local Board and its approval by the Commissioner should be sustained. In support of their appeal from the State Board's decision, the petitioners urge before us that under both federal and state law there was a duty to eliminate racial imbalance beyond the step which was taken by the local Board to correct the situation at the Washington School and which was sustained by the Commissioner and the State Board.

When in *Brown v. Board of Education of Topeka,* 374 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954), the Supreme Court struck down segregated schools, it recognized that they generate a feeling of racial inferiority and result in a denial of equal educational opportunities to the Negro children who must attend them. Although such feeling and denial may appear in intensified form when segregation represents official policy, they also appear when segregation in fact, though not official policy, results from long standing housing and economic discrimination and the rigid application of neighborhood school districting. *Brown* itself did not, of course, deal with the latter or *de facto* type of segregation and federal judges have differed as to whether that situation gives rise to

an affirmative duty under the Fourteenth Amendment to take suitable action. Compare *Bell v. School City of Gary, Indiana,* 213 *F. Supp.* 819 (*N. D. Ind.* 1963), aff'd 324 *F. 2d* 209 (7 *Cir.*), cert. denied 377 *U. S.* 924, 84 *S. Ct.* 1223, 12 *L. Ed. 2d* 216 (1964); *Downs v. Board of Education of Kansas City, Kansas,* 336 *F. 2d* 988, 998 (10 *Cir.* 1964), cert. denied 380 *U. S.* 914, 85 *S. Ct.* 898, 13 *L. Ed. 2d* 800 (1965), with *Barksdale v. Springfield School Committee,* 237 *F. Supp.* 543 (*D. Mass.* 1965); *Blocker v. Board of Education of Manhasset, New York,* 226 *F. Supp.* 208 (*E. D. N. Y.* 1964). See Kaplan, "Segregation Litigation and the Schools—Part II: The General Northern Problems," 58 *Nw. U. L. Rev.* 157, 170 (1963); Sedler, *supra,* 7 *St. Louis U. L. J.,* at *p.* 250.

In *Bell,* the court found that there was no official policy of segregation and that the Gary School Board had consistently required students to attend their neighborhood schools without regard to race; on that finding it concluded that the board was under no obligation under the federal constitution to take any steps towards integration of the school population or towards correction of the racial imbalance which existed in the Gary school system. See Kaplan, "Segregation Litigation and the Schools—Part III: The Gary Litigation," 59 *Nw. U. L. Rev.* 121 (1964). The decision in *Bell* may be contrasted with the recent decision in *Barksdale.* There an action was brought for a declaration that the Springfield School Committee had denied to the plaintiffs their rights under the Fourteenth Amendment by assigning them to racially segregated schools. The court found that there was no deliberate intent on the part of the school authorities to segregate the races, and that such segregation as did exist resulted from rigid adherence to the neighborhood plan of school attendance. But it also found that, although the Negro elementary school population was 17.4 per cent, there were schools with Negro population appreciably more than 50 per cent (*e.g.,* 59 per cent, 62.9 per cent, 75.3 per cent, 89.9 per cent), that the ability of Negro children to obtain equal educational opportu-

nities in such racially imbalanced schools was impaired, and that the local School Committee was under an affirmative obligation under the Fourteenth Amendment to eliminate racial concentration "to the fullest extent possible" within the framework of effective educational procedures. With reference to the holding in *Bell*, it had this to say:

"The defendants argue, nevertheless, that there is no constitutional mandate to remedy racial imbalance. *Bell v. School City of Gary Indiana*, 324 *F. 2d* 209 (7th Cir. 1963). But that is not the question. The question is whether there is a constitutional duty to provide equal educational opportunities for all children within the system. While *Brown* answered that question affirmatively in the context of coerced segregation, the constitutional fact—the inadequacy of segregated education—is the same in this case, and I so find. It is neither just nor sensible to proscribe segregation having its basis in affirmative state action while at the same time failing to provide a remedy for segregation which grows out of discrimination in housing, or other economic or social factors. Education is tax supported and compulsory, and public school educators, therefore, must deal with inadequacies within the educational system as they arise, and it matters not that the inadequacies are not of their making. This is not to imply that the neighborhood school policy *per se* is unconstitutional, but that it must be abandoned or modified when it results in segregation in fact." 237 *F. Supp.*, at *p.* 546.

See Fiss, "Racial Imbalance in the Public Schools: The Constitutional Concepts," 78 *Harv. L. Rev.* 564, 583 (1965).

Whether or not the federal constitution compels action to eliminate or reduce *de facto* segregation in the public schools, it does not preclude such action by state school authorities in furtherance of state law and state educational policies. See *Morean v. Bd. of Ed. Town of Montclair*, 42 *N. J.* 237, 242–244 (1964); *Addabbo v. Donovan, supra*, 256 *N. Y. S. 2d*, at *pp.* 182–184; *cf. Schults v. Bd. of Ed. of Township of Teaneck*, 86 *N. J. Super.* 29 (*App. Div.* 1964), aff'd 45 *N. J.* 2 (1965). In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be

laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority. It may well be, as has been suggested, that when current attacks against housing and economic discriminations bear fruition, strict neighborhood school districting will present no problem. But in the meantime the states may not justly deprive the oncoming generation of the educational advantages which are its due, and indeed, as a nation, we cannot afford standing by. It is heartening to note that, without awaiting further Supreme Court pronouncements, some states, including our own, have taken significant legislative or administrative steps towards the elimination or reduction of *de facto* segregation. See *Report of the United States Commission on Civil Rights 1963, pp. 55–62.*

The California State Board of Education has adopted regulations designed to avoid attendance areas which "in practical effect" discriminate upon an ethnic basis or tend to establish or maintain segregation on an ethnic basis. These regulations were cited by the California Supreme Court in *Jackson v. Pasadena City School District,* 59 *Cal.* 2d 876, 31 *Cal. Rptr.* 606, 382 *P.* 2d 878 (1963), where a Negro student brought an action seeking a transfer from his predominantly Negro neighborhood school to a predominantly white school. While its actual holding was narrower, the court's opinion clearly recognized that, under state law and policy, the school authorities have an affirmative duty to take steps towards alleviation of racial imbalance in the school system without regard to its origin. Speaking for all members of the court, Chief Justice Gibson said:

"So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to

frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." 382 *P. 2d,* at *pp.* 881–882.

See Note, "California Suggests De Facto School Segregation Must End," 16 *Stan. L. Rev.* 434 (1964); Note, "Schools and School Districts: Alleviation of Racial Imbalance," 51 *Calif. L. Rev.* 810 (1963).

New York's Board of Regents has issued statements of policy recognizing the insufficiency of public education in schools where segregation in fact exists and its State Commissioner has taken affirmative action towards elimination of racial imbalance wherever reasonably feasible. In a communication addressed to all local school administrators and boards, the Commissioner advised that the State Education Department's position was that racial imbalance in predominantly Negro schools "interferes with the achievement of equality of educational opportunity" and must be eliminated, and he requested that individual reports be submitted by school districts with respect to their racially imbalanced schools and the corrective steps being taken. (For the purposes of these reports the Commissioner defined a racially imbalanced school as "one having 50 per cent or more Negro pupils enrolled.") The broad scope of the supervisory powers vested in the Commissioner and the forthright manner of their exercise are well illustrated by the recent litigation in *Vetere v. Allen,* 41 *Misc. 2d* 200, 245 *N. Y. S. 2d* 682 (*Sup. Ct.* 1963), modified *Vetere v. Mitchell,* 21 *A. D. 2d* 561, 251 *N. Y. S. 2d* 480 (1964), aff'd *Vetere v. Allen,* 15 *N. Y. 2d* 259, 258 *N. Y. S. 2d* 77, 206 *N. E. 2d* 174 (1965), petition for cert. filed 33 *U. S. L. Week* 3412 (June 22, 1965).

In *Vetere* the school district had three elementary schools. As a result of the concentration of Negroes in a specific area

of the community, the Woodfield School had a Negro pupil population of 75 per cent whereas in each of the other two schools it was 14 per cent. The local board refused to take any corrective action and several Negro children appealed through their parents to the Commissioner. The Commissioner heard oral argument, received recommendations from his Advisory Committee on Human Relations and Community Tensions, and directed the local board to adopt a plan prepared by the Committee and approved by the Commissioner. Thereafter the local board submitted a proposed plan but it was rejected by the Commissioner who ordered the effectuation of his own plan which called for the attendance of all fourth and fifth grade pupils at the Woodfield School and all lower grade pupils at the other schools. On appeal, a trial judge annulled the Commissioner's order but this action was vacated by the Appellate Division which found that there was support in the record for the Advisory Committee's recommendation and the Commissioner's determination, that the Commissioner's decision was neither arbitrary nor capricious, and that the court could not "substitute some other judgment for the judgment of the Commissioner that correction of racial imbalance is an educational aid to a minority group in attaining the skills and level of education which others have had for generations and that compulsory education should be designed for the greatest good of all." 251 *N. Y. S. 2d*, at *pp.* 483–484. On further appeal, the New York Court of Appeals affirmed the Appellate Division, holding that the Commissioner's decision, based on the finding that correction of racial imbalance was essential to sound education, was not arbitrary or illegal. See *Board of Education of City of New York v. Allen*, 6 *N. Y. 2d* 127, 188 *N. Y. S. 2d* 515, 160 *N. E. 2d* 60 (*Ct. App.* 1959); *Van Blerkom v. Donovan*, 15 *N. Y. 2d* 399, 259 *N. Y. S. 2d* 825, 207 *N. E. 2d* 503 (*Ct. App.* 1965).

Our own State's policy against racial discrimination and segregation in the public schools has been long standing and vigorous, and our Commissioner of Education has been

vested with broad power to deal with the subject; indeed, his power in this regard may fairly be viewed as no less comprehensive in nature than that possessed by New York's Commissioner and exercised by him in *Vetere*. *Cf. Blumrosen, Securing Equality: The Operation of the Laws of New Jersey Concerning Racial Discrimination*, 71 *et seq.* (1964); *Blumrosen*, "Anti-discrimination Laws in Action in New Jersey: A Law-Sociology Study," 19 *Rutgers L. Rev.* 189, 261 (1965). As early as 1881 there was legislation in New Jersey declaring it unlawful to exclude a child from any public school because of his race (*L.* 1881, *c.* 149) and this appears in broadened form in our current statutes. *N. J. S. A.* 18:14–2. When called upon, our courts have not hesitated to strike down direct and indirect efforts to circumvent the legislative direction. See *Pierce v. Union District School Trustees*, 46 *N. J. L.* 76 (*Sup. Ct.* 1884), aff'd 47 *N. J. L.* 348 (*E. & A.* 1885); *Raison v. Bd. of Education, Berkeley*, 103 *N. J. L.* 547 (*Sup. Ct.* 1927); *Patterson v. Board of Education*, 11 *N. J. Misc.* 179, 164 *A.* 892 (*Sup. Ct.* 1933), aff'd 112 *N. J. L.* 99 (*E. & A.* 1934); *Hedgepeth v. Board of Education of City of Trenton*, 131 *N. J. L.* 153 (*Sup. Ct.* 1944).

New Jersey's strong policy against racial discrimination and segregation in the public schools finds further expression in *Article 1, paragraph 5* of the 1947 *Constitution* which provides that "[n]o person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, * * * nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin." In 1949 the Legislature broadened its earlier law against discrimination (*L.* 1945, *c.* 169) to embody provisions against discrimination in places of public accommodation. *L.* 1949, *c.* 11. See *Levitt & Sons, Inc. v. Div. Against Discrimination, etc.*, 31 *N. J.* 514, *appeal dismissed*, 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed. 2d* 1515 (1960); *Jones v. Haridor Realty Corp.*, 37 *N. J.* 384 (1962). As thus broadened, the law provides that all persons shall have the opportunity to obtain

"all the accommodations, advantages, facilities, and privileges of any place of public accommodation," including any public school, "without discrimination because of race." *N. J. S. A.* 18:25–4; *N. J. S. A.* 18:25–5. In *Walker v. Board of Education of the City of Englewood* (decided May 19, 1955), the Attorney General advanced the contention before the Commissioner of Education that this law, in itself, precluded a board of education "from permitting the existence of segregation—in fact" when it could reasonably be eliminated. See *Greenberg, Race Relations and American Law* 251 (1959). The Commissioner, while expressing his full awareness of *Brown* and its holding that school segregation on the basis of race deprives the minority children of "equal educational opportunities," did not pass on this contention although he did direct the Englewood Board to draw new boundary lines and to eliminate a school which he found to be maintained in "violation of the law against discrimination."

In a series of cases commencing with *Fisher v. Board of Education of the City of Orange, supra,* the Commissioner has dealt with attacks on *de facto* school segregation which came before him in proceedings under *R. S.* 18:3–14. That statute provides that the Commissioner shall decide all controversies and disputes under the school laws or under the rules and regulations of the State Board or of the Commissioner. Its comprehensive terms were liberally implemented by the opinions of this Court in *Laba v. Newark Board of Education,* 23 *N. J.* 364, 381–384 (1957), and *In re Masiello,* 25 *N. J.* 590, 605–607 (1958), where we stressed the Commissioner's overriding responsibility "to make certain that the terms and policies of the School Laws are being faithfully effectuated."

In *Fisher* it appeared that the pupil enrollment in Orange was 50 per cent white and 50 per cent Negro and that enrollment in the Oakwood School was 99 per cent Negro. The Commissioner, although he found that the Oakwood segregation resulted from housing problems rather than from official policy, determined (1) that attendance at the Oakwood School engendered feelings and attitudes "which tend to interfere

with successful learning," (2) that such extreme imbalance as obtained at Oakwood constituted under New Jersey law "a deprivation of educational opportunity for the pupils compelled to attend the school," and (3) that reasonable means "consistent with sound educational and administrative practice" existed and must be taken to avoid the concentration of Negro pupils at the Oakwood School.

In *Spruill v. Board of Education of the City of Englewood* (decided July 1, 1963), it appeared that the Negro pupil population of Englewood was 39.1 per cent and that the Negro population at the Lincoln School was 98 per cent. The Commissioner found that there had not been any showing of deliberate intent by the school board to segregate but held nevertheless that the Lincoln School must be desegregated under the principles expressed by him in *Fisher*. In the course of his opinion he pointed to the advantages which ordinarily accompany the neighborhood school policy but then went on to state that "the assignment of pupils to nearby schools is a general principle and is not to be applied inflexibly when other considerations outweigh its values." He did not prescribe any plan of his own for reducing the racial imbalance in the Lincoln School but noted instead that several plans had been proposed and that the local board was the one charged with the formulation of the most suitable plan; in this connection, he quoted from and relied upon his own opinion in the *Booker case*, now before us. See *Fuller v. Volk*, 230 *F. Supp.* 25 (*D. N. J.* 1964).

In *Alston v. The Board of Education of the Township of Union* (decided April 6, 1964), the local board adopted a voluntary optional pupil transfer policy for the regular pupils of the Jefferson School which had a 95 per cent Negro enrollment in a community having a 10 per cent Negro school population. The petitioners contended that the board's plan was inadequate and they requested that the Commissioner formulate a plan of his own. In dismissing the petition without prejudice to its renewal at a later date, the Commissioner rejected the contention that the local board's plan was ineffec-

tive, pointing out that it had not been given a fair trial and that he could not indulge in any presumption that it would fail to achieve its purpose. In discussing the request that he formulate his own plan, he stated that the choice among the various solutions proposed should be made "in the first instance" by the local board and that on appeal he must "keep within proper limits of judicial inquiry." In elaboration of this latter thought, the Commissioner quoted from *Boult v. Board of Education of Passaic* (decided January 8, 1946), aff'd 135 *N. J. L.* 329 (*Sup. Ct.* 1947), aff'd 136 *N. J. L.* 521 (*E. & A.* 1948), where one of his predecessors had expressed the view that it was "not a proper exercise of a judicial function for the Commissioner to interfere with local boards in the management of their schools unless they violate the law, act in bad faith (meaning acting dishonestly), or abuse their discretion in a shocking manner."

█ *Boult* dealt with a local board's power to discontinue a school and had no relation to segregation or race. However, the Commissioner's quotation of its language would indicate that his position as to the scope of his authority and responsibility when passing on local steps towards desgregration is too restrictive and not fully compatible with our decision in *In re Masiello, supra,* 25 *N. J.* 590. In *Masiello* the Commissioner took the view that when reviewing action of the Board of Examiners his function is simply to determine whether its action was "arbitrary or capricious or whether it was the result of bias or prejudice." 25 *N. J.*, at *p.* 605. We rejected this view, pointing out that under *R. S.* 18:3–14 the Commissioner is to decide all controversies and disputes arising under the school laws or under the rules of the State Board or of the Commissioner, and that this involves a responsibility on his part to make independent determinations, giving due weight, of course, to the findings and actions and the measure of discretion vested below. 25 *N. J.*, at *p.* 606; *cf. Kopera v. West Orange Bd. of Education,* 60 *N. J. Super.* 288, 295–297 (*App. Div.* 1960). None of this brings into question the Commissioner's policy, as expressed in *Alston,*

of leaving to the local board the choice in the first instance among the various solutions proposed towards the elimination of *de facto* school segregation. But it does mean that when the sufficiency of the local choice is brought before him he must affirmatively determine whether the reasonably feasible steps towards desegregation are being taken in proper fulfillment of State policy; if not, he may remand the matter to the local board for further action or may prescribe a plan of his own as was done in *Velere. Cf. Laba v. Newark Board of Education, supra*, 23 *N. J.*, at *pp.* 381–384.

In one additional respect the Commissioner, along with the State Board in sustaining his pertinent determinations, has taken a position which we deem too restrictive. While he has broadly recognized and acted on the principle that *de facto* segregation has an undesirable effect upon attitudes related to successful learning and denies equal educational opportunities to the racial minority, he has narrowly confined relief to situations where the schools in question were entirely or almost entirely Negro. This may be contrasted with *Vetere* where the Commissioner ordered the desegregation of a school with 75 per cent Negro pupil population, with *Barksdale* where the court ordered the desegregation of schools with Negro pupil populations appreciably more than 50 per cent but less in substantially varying amounts than 90 per cent, and with the general tenor of our own opinion in *Morean v. Bd. of Ed. of Montclair, supra*. In *Morean* we first noted that an official policy of segregation would not be consistent either with sound legal principles or sound educational policies and then pointed to the fact that racial imbalance, though fortuitous in origin, presents much the same disadvantages as are presented by segregated schools. 42 *N. J.*, at *pp.* 242–243. While we there made no attempt to define the precise extent of racial imbalance which would require remedial action, we did refer approvingly to *Jackson v. Pasadena City School District, supra,* where the court, after indicating that substantial racial imbalance would call for relief, cautioned that exact apportionment of Negroes among the

schools was not required and that consideration must be given to all relevant factors "including the practical necessities of governmental operation." 382 *P. 2d*, at *p.* 882

In the case at hand, Dr. Wolff acknowledged that there was no fixed racial composition that students of the subject considered ideal for all communities and he suggested that a desirable distribution of white and Negro children would be a range of one-third greater or less than the percentage of Negro pupils to white pupils in the whole elementary school system. In *Bell v. School City of Gary, Indiana, supra,* District Judge Beamer said that this might be a good sociological definition but that there was no support for it as a legal definition. 213 *F. Supp.*, at 829. In *Barksdale* Chief Judge Sweeney made the finding that in the light of the relation of white to non-white in the City of Springfield, "a non-white attendance of appreciably more than fifty per cent in any one school is tantamount to segregation." 237 *F. Supp.*, at *p.* 544. Elsewhere racially imbalanced schools have been described as those predominantly or substantially Negro in view of the ratio throughout the school system;[2] and, occasionally, fixed percentages in varying amounts have been urged. See Kaplan, *supra,* 58 *Nw. U. L. Rev.*, at *p.* 181; Fiss, *supra,* 78 *Harv. L. Rev.*, at *p.* 579. Before us, the petitioners have not advanced any fixed percentage but have presented the thought that, at some ascertainable point, the Negro population of a school becomes so excessively high, in contrast to the percentage of Negroes in the schools of the same level in the community, that it becomes known as a Negro school with the attendant "sense of stigma and resulting feeling of inferiority" referred

---

[2] The recent *Report of the Advisory Committee on Racial Imbalance and Education, Massachusetts State Board of Education* April, 1965, refers to racial imbalance as a ratio between Negro and other students in public schools "which is sharply out of balance with the racial composition of the society in which Negro children study, serve and work." The report expresses the committee's thorough conviction that students attending predominantly Negro schools are denied equal educational opportunity and that racial imbalance is educationally harmful to all children, white and non-white. See *pp.* 1–6.

to in *Fisher v. Board of Education of the City of Orange,* *supra.* That point generally may be well above 50 per cent but well below the Commissioner's and State Board's 100 per cent or nearly 100 per cent, as evidenced by the racially imbalanced schools stricken in *Vetere* and *Barksdale.*

As in *Vetere* and *Barksdale,* the goal here is a reasonable plan achieving the greatest dispersal consistent with sound educational values and procedures. This brings into play numerous factors to be conscientiously weighed by the school authorities. Considerations of safety, convenience, time economy and the other acknowledged virtues of the neighborhood policy must be borne in mind. Costs and other practicalities must be considered and satisfied. And trends towards withdrawal from the school community by members of the majority must be viewed and combatted, for if they are not, the results may be as frustrating as the inaction complained about by the minority. In his report, Dr. Wolff enumerated the advantages and disadvantages of both of his plans which were aimed at correcting racial imbalance throughout the entire elementary school system while preserving, wherever possible, the neighborhood policy. Both plans contemplated the closing of the Bryant School which was described as "the oldest, least efficient and most expensive school in the city." As outlined by Dr. Wolff, the advantages of each plan were substantial whereas its disadvantages were insubstantial and the Commissioner acknowledged that each of the plans was reasonable, practicable and consistent with sound educational practice. He nonetheless sanctioned their rejection and permitted the local Board to put into effect its own Sixth Grade Plan which he also found to be a proper one. But that plan, while it had the highly desirable effect of integrating the Washington School, was not pointed towards the goal of greatest dispersal in the school system as a whole and did nothing helpful towards meeting the racial imbalance at schools such as Bryant which, as of October 1964, had a Negro pupil population of 78.6 per cent. It appears evident to us that in granting approval of the Sixth Grade Plan with-

out more, the Commissioner was misled by unduly restrictive views, hereinbefore indicated, (1) as to the scope of his own functions in reviewing and supervising local actions, and (2) as to his own responsibilities in the correction of substantial racial imbalance which may be educationally harmful though it has not reached the standard of "all or nearly all Negro."

At oral argument it was indicated that further steps towards correcting the racial imbalance in the elementary schools of Plainfield were now being considered by the local Board. Respondent's counsel stressed that the responsibility for maintaining a sound educational system rests primarily with the school authorities and he urged that the decision of the Commissioner and the State Board, sustaining the local Board's Sixth Grade Plan, not be disturbed. The petitioners have readily joined the respondent's position that the primary responsibility is that of the school authorities and they do not suggest that this Court direct what specific plan should be adopted; their prayer for relief, as voiced during oral argument, is that the matter be remanded to the Commissioner for further consideration and action on his part pursuant to the judicial views expressed in this Court. They are clearly entitled to that relief. The Commissioner will, of course, be at liberty to have the record supplemented by such further evidence and plans as he may call for or as the parties may choose to present. Thereafter he will make whatever determination and take whatever action appears appropriate under the circumstances and the governing principles set forth earlier in this opinion.

Reversed and remanded.

HALL, J. (concurring in part and dissenting in part).

While I agree that this case should be remanded for reconsideration at the administrative level, I would do so on quite a different thesis than I understand the majority to dictate. My difference of view arises from its conception and treatment of the basic issue in the case. Involved in this difference is the even deeper question of the proper role of the judiciary

in the resolution of the complex, difficult and important matter of racial imbalance in public schools. It is appropriate that these fundamentals be carefully examined since this is the first case to come to this Court dealing with the *obligation* of school authorities to remedy racial imbalance, *i.e.*, a proceeding to compel initial or additional action, as distinct from a challenge to steps voluntarily taken in that direction (without regard to whether the particular situation was such that some action could have been compelled) on the ground that other alleged rights were violated thereby. The latter category of litigation is exemplified by *Morean v. Board of Education of Town of Montclair*, 42 *N. J.* 237 (1964), and *Schults v. Board of Education of the Township of Teaneck*, 86 *N. J. Super.* 29 (*App. Div.* 1964), affirmed 45 *N. J.* 2 (1965).

The basic issue posed by the petitioners is essentially an abstract one on a constitutional plane. The thesis boils down to a claim of denial of equal protection under the Fourteenth Amendment of the United States Constitution and a denial of a civil right under *Art.* I, *par.* 5, of the New Jersey Constitution when, solely by reason of attendance zones based on residence, the large majority of Negroes attend one set of schools in a municipality, the large majority of whites attend another set, and the percentage of Negro pupils in one or several schools exceeds that of white pupils to some degree. The contention is that such a situation amounts, *ipso facto* and with little regard to the actual degree of the imbalance in a particular school, to a denial of equal educational opportunity, which is equated with equal protection of the laws, and to "segregation in the public schools" within the prohibition of the state constitution, and requires corrective action in that fashion which will accomplish the greatest dispersal of the races.

It should be noted that no claim is made that the racial composition of the Plainfield schools has resulted from any invidious action, or indeed nonaction, of the Board of Education in prescribing attendance zones. In other words, the

pupil composition of the individual Plainfield schools when this litigation was commenced was not determined on the basis of race. Nor is it contended that the Board has callously ignored the situation. In fact, it is evident that the attitude has rather been one of alertness and activity, whether or not one agrees with what was done, making due allowance for the immense ramifications of the problem in the light of the Board's manifold responsibilities for the proper administration of the entire school system of the city and the highly uncertain state of the law during the period. The point urged is rather that the Board has not gone as far in the measures undertaken as it is legally compelled to. It may be further noted that there is nothing of value in this record to support any charge that the Board or the professional administration has been discriminatory in the spending of available funds, the providing of physical equipment or the assignment of staff with respect to elementary schools where Negro pupils are in the majority, and such a charge is in fact not seriously advanced.

The foundation for "denial of equal educational opportunity" is expressed in petitioners' contentions contained in the stipulation upon which the case was submitted to the Commissioner:

"* * * the color distribution of elementary school pupils which are predominantly Negro, or nearly so, tends to produce a sense of stigma and a feeling of inferiority in the minds of Negro pupils and their parents, results in an undesirable effect upon their attitudes toward education and interferes with successful learning."

This concept had its legal origin in *Brown v. Board of Education of Topeka*, 347 *U. S.* 483, 494, 74 *S. Ct.* 686, 98 *L. Ed.* 873, 880–881 (1954), where, however, the United States Supreme Court was dealing with state enforced separation of school children solely because of their race and rejecting the prior "separate but equal" doctrine.

The Commissioner has concurred in this proposition, with respect to a school "whose enrollment is completely or almost

exclusively Negro," as a sound and correct educational tenet and as a declaration of state policy, by his opinion in *Fisher v. Board of Education of City of Orange*, handed down about six weeks before his decision in the instant case. There can be no quarrel with this sound and salutary conclusion, whether it be based on evidence received in other litigation before the Commissioner or on his own expertise. He and the State Board of Education applied the same principle here in sustaining the Sixth Grade Plan as an appropriate means of correcting the extreme imbalance in the Washington School.

The emphasis in this approach is, of course, educational, founded on a psychological base, with any legal connotations deriving therefrom. Put in another way, it would seem that the fundamental of the proposition is that variation of an otherwise proper pupil assignment method should be compelled, where race is involved, only when the racial composition of the school results in an educational detriment, in the broadest sense of that term, and in order to serve an educational purpose. It seems to me further implicit in this approach that consideration of corrective measures also involves matters of practicality and the balancing of many things before a particular remedy can or should be ordered. There undoubtedly are situations where the racial composition of a particular school or group of schools is such that reassignment of pupils is educationally called for but where there just is no realistically or practically possible solution available or where the over-all disadvantages of a solution completely over-balance desirable benefits.

I am convinced that this approach is the only sound and proper one from every angle, including the legal one, and further that its implementation belongs in the first instance with school authorities at the local and state levels rather than with the courts. I for one, and I would think judges generally, have no special competence and courts have no proper function in matters of educational policy or the manifold details of school administration. These belong with the local school board and the state education department. The

judicial role should be confined to its usual one of review of administrative action, deciding only whether that action is legally or factually unreasonable or arbitrary.

As I read the Commissioner's opinion, he did not, however, expressly decide whether denial of equal educational opportunity in the sense outlined above, results where the Negro pupil percentage is less than total or almost so. The State Board in its opinion says the Commissioner held that such lesser percentages in several Plainfield schools did not in fact result in deprivation of equal educational opportunities calling for any remedial action with respect to those schools. Any such thought has to come from the Commissioner's failure to mention the matter and I am not convinced that he passed on it at all. It does seem to me that this question of what percentage level of Negro pupils in a school results in such denial of equal educational opportunity and requires local corrective measures is the initial and real question in this case and that it has to be decided at the state administrative level before the sufficiency of the Sixth Grade Plan may be properly evaluated there or in the courts. It appears not unreasonable for an educational layman to think that something less than 95% of Negro pupils might well produce the same educationally damaging stigma of racial inferiority. On this score, it may be parenthetically observed that petitioners' counsel conceded at oral argument that, if this question were the vital one, some arbitrary mathematical line would have to be drawn, but he could place it no more definitely than at that point where a particular school bears the community connotation of a "Negro" school. He indicated that such a point would not be reached until the enrollment was somewhat more than 50% Negro and that in Plainfield a school with 75% Negro pupils would certainly carry the stigma.

The rationale of the majority, on the other hand, which substantially follows the petitioners' thesis previously summarized, is quite different. While it has to start from the same place—that a predominantly Negro student body in a school interferes with successful learning and attitudes by

reason of a sense of stigma and feeling of racial inferiority and so denies equal educational opportunity—, it in effect treats the application of that concept as nearly an automatic legal matter rather than as a factual educational one. The whole tone of the opinion indicates that any feasible plan of pupil reassignment which will produce the greatest racial dispersal is compelled almost upon the mere existence of racial imbalance in a school without much regard for other considerations.

In my view neither present federal nor state law dictates or even supports the majority's conclusion. At the federal level, certainly *Brown v. Board of Education of Topeka, supra* (347 *U. S.* 483, 74 *S. Ct.* 686), is no authority. As earlier pointed out, the United States Supreme Court was there striking down compulsive separation of school children solely because of their race and upsetting the "separate but equal" doctrine upon which such treatment had previously been constitutionally sanctioned. It has since made clear that the principle there laid down may not be avoided or circumvented by any strategems. *Goss v. Board of Education,* 373 *U. S.* 683, 83 *S. Ct.* 1405, 10 *L. Ed.* 2d 632 (1963). This, of course, is not such a case and the court has not dealt with anything like it. There is a vast difference, constitutionally, between saying that a child must go to a certain school and cannot go to another simply because of his color and assigning all pupils to schools, irrespective of race, on a good faith basis of their place of residence. Although it is axiomatic that denial of *certiorari* by the United States Supreme Court does not constitute an affirmance or any adjudication on the merits of the case, I do not think it is completely without significance that the court has recently declined to review decisions of two federal Circuit Courts of Appeals upholding school assignment plans based on residence which had resulted in extreme racial imbalance—very considerably greater than that in Plainfield—in the city school systems involved. *Bell v. School City of Gary, Indiana,* 213 *F. Supp.* 819 (*N. D. Ind.* 1963), affirmed 324 *F. 2d* 209 (*7 Cir.*), *cert.* denied 377 *U. S.* 924,

84 *S. Ct.* 1223, 12 *L. Ed.* 2d 216 (1964) ; *Downs v. Board of Education of Kansas City, Kansas,* 336 *F.* 2d 988 (10 *Cir.* 1964), *cert.* denied 380 *U. S.* 914, 85 *S. Ct.* 898, 13 *L. Ed.* 2d 800 (1965).

Nor can I find the question before us controlled by the provision of the New Jersey Constitution forbidding segregation in the public schools or the anti-discrimination law implementation of the constitutional guarantee of civil rights. Both are aimed at quite different situations. As to the segregation prohibition of the 1947 Constitution, it was, of course, adopted long before *Brown v. Board of Education of Topeka, supra* (347 *U. S.* 483, 74 *S. Ct.* 686). Its purpose was clearly stated by the proponent at the Constitutional Convention:

"Argument no doubt will be made that it is not necessary to have a clause with respect to the public schools. I think it is necessary because a peculiar situation exists in our State. I think it is a situation that should be corrected in the Constitution itself. In one whole section of the State, which we generally refer to as North Jersey, there is no discrimination on account of race in the public schools. In another section, South Jersey, there is discrimination, and separate schools according to races. That does not conform to the statutes. As far as the law of the State is concerned, it doesn't conform to the statutes.

Now, my belief is that if we put it in the Constitution, it will be settled once and for all. There will be no controversy over the subject. It has been the source of quite a good deal of litigation in the courts and the [clause] will avoid the necessity of future legislation." 1 *Convention Proceedings, Constitutional Convention of* 1947, 596.

Despite the fact that the ancestor of *R. S.* 18:14–2 referred to in the quoted passage had been on the statute books since 1881, it was well known that the statutory prohibition had not been uniformly and stringently enforced, even in the more northerly sections of the State, and the organic law provision was included to make that matter certain at the highest level.

The anti-discrimination law, *N. J. S. A.* 18:25–1, *et seq.,* is directed to the outlawing of "practices of discrimination * * * because of race, creed, color, national origin, ancestry, age or because of their liability for service in the Armed

Forces of the United States * * *," *N. J. S. A.* 18:25-3, *i.e.*, separate or different treatment in any of the categories covered by the statute solely by reason of any of the factors mentioned. By hypothesis, again this is not such a case and I do not think that this statute can reasonably be said to have controlling impact on the matter of school racial imbalance brought about by uniform pupil assignment according to residential location. While the Legislature undoubtedly has the power to act in this particular field, it has not done so, although the question has been a matter of unfortunate controversy in many communities in the State for a considerable time. It is not unreasonable to believe, therefore, that that branch of government has to date conceived the matter as one to be treated as an educational problem, committed under general law to the state education department and local school boards.

The majority also suggests that its rationale and conclusion were foretold and are supported by this court's decision in *Morean v. Board of Education of Town of Montclair, supra* (42 *N. J.* 237). I did not then and do not now so understand that opinion. There the Montclair Board of Education was confronted with one junior high school having a 90% Negro population, another 60%, and the third 18%. The Board voluntarily adopted a plan to close the first and reassign its and other pupils in the system. The plan had an educational object, under the undoubted motivation of relieving racial imbalance which was causing education detriment. The attack was by whites who were reassigned to other than their neighborhood schools in implementation of the plan and claimed violation of rights thereby. The plan was sustained. I understand the very proper holding and implications of the decision to be that a local board of education may voluntarily assign or reassign pupils as it believes desirable on other than a residence location basis for educational reasons even if those reasons have their foundation in the alleviation or future prevention of racial imbalance in one or more schools. Its true tenor, to me, is the educational approach comparable to

that which I urge in the case before us. Further, the opinion to me implies that there is no constitutional or statutory right to attend a neighborhood school, notwithstanding its many desirable features especially in the case of young children, and that the neighborhood school policy in a democratic society in this day and age may not be used simply to maintain a pupil population comprising a particular ethnic or socio-economic group. *Cf.* dissenting opinion in *Vickers v. Township Committee of Gloucester Twp.*, 37 *N. J.* 232, 252, 264–266 (1962).

Considering the majority rationale from another angle, it seems to me that it may also be said to amount to a judicial finding that educational detriment requiring correction occurs almost automatically whenever the Negro population in a school becomes the majority. I earlier pointed out my thought that this approach is the wrong one for a court to take, *i.e.*, that the matter should be treated as one of educational policy and implementation to be decided in the first instance by those knowledgeable in and charged with the primary responsibilities in that field. My view is not reached with any thought of evading or trying to sweep under the rug the necessity for constant consideration and efforts at solution of the immense and difficult problem of Negro improvement. There can be no question but that, even in the North, the Negro has not been accorded the full status and equal opportunity in so many fields to which he is thoroughly entitled as a citizen and an individual human personality. There has been and is prejudice against him in employment, housing and other avenues which has led in a vicious circle to the perpetuation of poverty and the ghetto, with all of their personal and social evils, and a feeling of inferiority, despair and hopelessness, with consequent damage to the whole of American life. Whites must take the initiative to reverse this condition by changes of heart and mind and concrete deeds. There must be continual affirmative action in all fields under the cooperative and high-minded direction of leaders of both races. The approach on both sides should be intelligent rather than emo-

tional or adamant, to bring us all to an attitude of mutual respect and of living and working together in harmony in a multi-racial and multi-cultural democratic nation.

The improvement of educational achievement offers a principal means of breaking the vicious circle. Indeed, this goal applies to those of all races as the scope of current anti-poverty programs makes clear. It means and demands a lot more by way of pre-school and school programs than mere further mixing of the races in a school building, as the high-vision majority report of the Plainfield Lay Advisory Committee so cogently points out. Reducing racial imbalance in schools undoubtedly is an important and necessary element in the over-all picture, but when and how that tool should be utilized ought to be decided in the first instance by educators from the standpoint of furtherance of educational purpose and not by judges.

Although the majority opinion is rather imprecise with respect to its practical impact, the theme appears to run through it that the Commissioner must ultimately order the Plainfield board to adopt one of the Wolff plans. This implication is at least unfortunate. In view of the abstract question which petitioners put to the Commissioner, the merits and demerits of these plans as contrasted with the Sixth Grade Plan were not tried out. On what there is in the record concerning the Board's conclusions as to respective advantages and disadvantages under the enrollment situation on which the Commissioner decided the case in 1963, and assuming that only the heavily imbalanced Washington School educationally required correction then, I cannot say within the proper role of a judge, that the Board acted improperly, in the light of its responsibilities to the whole community, in adopting the Sixth Grade Plan or that the Commissioner and State Board were utterly wrong in approving that local exercise of discretion. Matters of building capacity and utilization, financial limitations, lengthy distances from home to school, and transportation and traffic hazard problems, among others, are considerations which a local board cannot overlook. Extensive

bussing or long walks to school for young children are matters of concern to parents whether white or Negro.

I have said that I agree that this case must be remanded to the Commissioner for redetermination. There are two reasons. The first, to which I have already adverted, is that he should clearly decide whether denial of educational opportunity in the sense involved here results at a Negro pupil percentage of less than total or almost so, and, if so, at what point. In that connection, I strongly feel that this matter of vital state educational policy ought to be determined on a uniform guide line basis, by rule and regulation if you will, through the action of the State Board and the Commissioner in their respective spheres. To leave it to case-by-case development in adversary litigation, it seems to me, does a disservice to everyone. There can be no doubt of the power so to act at the state level and the subject would appear as important to the whole state as school building regulation and curriculum approval which are now controlled at the state level. This course has been followed, as the majority points out, in New York and California. It has the distinct advantage of letting all know in advance generally what must be done, when and how. It would lead to uniform operation and enforcement without dependence merely on the individual initiative, or lack of it, of certain boards of education or interested groups. Even more significant, advance formulation of state policy would do much to avoid the tensions and adverse effects on community race relations which litigation inevitably produces. Such controversies can readily tear a community apart, almost beyond repair.

The Plainfield situation well illustrates the point. This controversy has obviously been festering and doing the city and all its people no good for about four years, with the litigation pending for almost three. When the Board adopted the optional pupil registration plan in July 1962, no state policy or decision on the problem had been announced. The leading out-of-state case at that time was *Taylor v. Board of Education of New Rochelle,* 294 *F.* 2d 36 (2 *Cir.*), *cert.*

denied 368 *U. S.* 940, 82 *S. Ct.* 382, 7 *L. Ed.* 2d 339 (1961), where invidious action had been found and the right of open transfer from the heavily imbalanced school directed as the appropriate remedy. I would think that the Plainfield Board would also have been apprehensive as to what further it might legally do without running into the then unsettled problem of the possible violation of claimed rights of others than Negroes. *Morean* did not settle this aspect until May 1964. The Board's legal uncertainty is shown by its answer to the petition, where it set forth its doubts and sought the direction of the Commissioner. Nothing came from him apparently until May 1963, when he decided the Orange case requiring remedial measures only where one school was completely or almost exclusively Negro although three others had 50% or more Negro pupils. The Board then adopted the Sixth Grade Plan, a measure which had been used frequently elsewhere. It was in this posture that the Commissioner decided this case in June 1963, and matters have remained in *status quo* since. Advance promulgation of state policy would have avoided many of the present difficulties here. It is not too late to decide and announce it for the problem is or will be a live one in many New Jersey school districts for some time yet to come.

The second reason why the Commissioner must reconsider is that the enrollment situation in Plainfield has changed substantially since the litigation was commenced. In essence, the Commissioner decided one factual case, the State Board a different one, and this Court still a third. This is a further illustration of the distinct disadvantages of determining questions of this kind through case-by-case litigation. In 1962, Plainfield's total population of over 45,000 was about 25% Negro, as far as can be gathered from the record. The then elementary school enrollment of about 5150 pupils was approximately 1900, or 37%, Negro and 3250 white, allocated by residence among 11 schools, all of which accommodated grades kindergarten through six. One of them, Washington, had a Negro population of 95.1%. The next highest percent-

ages were 64.8%, 59.5% and 57.3%. Two other schools were at 45.8% and 43.2%. These six schools accommodated about one-half of the total elementary enrollment. The other five had Negro percentages ranging from 24.1% to 0.

The Commissioner decided the case on the April 1, 1963 enrollment figures. By that time the total elementary population was about 5400, with the Negro percentage at 40.4. The total number of Negro pupils had increased by about 280 as contrasted with a slight decrease in the number of white pupils. The percentage of Negro enrollment had increased in every school but one. Washington was now at 96.2% and the next five schools at 72.1%, 67.6%, 65.5%, 58.9% and 44.9%.

The State Board determined the matter on the basis of the October 1963 figures which reflected the fact that the Sixth Grade Plan had been put in operation. The total enrollment still remained at 5400, but there were now about 170 more Negro pupils than in the preceding April and a correspondingly less number of whites. The over-all Negro percentage stood at 43.6%. Over 500 Negro pupils in grades kindergarten through five in the Washington School had been transferred in September to other schools, although none to a school which at that time had more than a 50% Negro enrollment. Negroes now attended every school and every elementary classroom in the city. Sixth grade pupils throughout the city all now attended Washington School and the Negro percentage there had dropped to 36.6. The schools formerly over 50% to which no transfers had been made, and which still received pupils only on the basis of residence within their attendance zones, had risen to 76.4%, 65.2%, 67.1% and 66.1% Negro enrollment. Jefferson School, to which some transfers had been made, formerly at 44.9%, was now 52.1% Negro. The other five schools which had received the great bulk of the pupils transferred from Washington stood at 40.8%, 39.8%, 26.5%, 17.7% and 23.4% Negro.

The latest figures furnished us depict the enrollment as of October 1, 1964. The total was then about 5500, of which 47.3% were Negroes. The Washington School percentage had

become 42.1%. The Negro percentages in the next four which had received no pupils in the transfer stood at 75.7%, 65%, 78.6% and 71.3% Negro. The remaining schools had Negro percentages of 56.6%, 43.4%, 49.7%, 30.9%, 18.8% and 24%.

What had happened since the Commissioner decided the case on the basis of April 1, 1963 figures is that, while the total enrollment increased by but approximately 130, the number of Negro pupils had increased by over 400 and the white enrollment had dropped by about 300. This would seem to indicate further Negro migration into the city and withdrawal of white pupils from the public schools. While four schools now had Negro enrollments of between 65% and 78%, the increases therein were in no way due to the adoption of the Sixth Grade Plan, since no transfers were made to them, but rather appear ascribable to greater Negro residence in their zones and perhaps to certain residential areas of the city having become available to Negroes for the first time.

Be this as it may, the present enrollment picture is obviously very different from that which formed the basis of the Commissioner's decision. The sufficiency of the Sixth Grade Plan should clearly be reconsidered and decided, under the educational policy approach I have suggested, on up-to-date figures as well as the probabilities for the near future.

The majority directs a reversal of the State Board, and consequently of the Commissioner, as well as a remand and redetermination. It seems to me that whether the Sixth Grade Plan is an appropriate and adequate corrective measure for the Plainfield Board to continue or whether something different is now educationally required in the light of current conditions depends on the Commissioner's redetermination, first, of when racial imbalance causes such educational detriment as to dictate remedial action, and second, of the nature of the corrective action indicated for Plainfield within those guidelines in the light of all considerations and of the responsibility and discretion reposed in the local board. The

result so reached may be the same as that previously arrived at or it may not be. Remand for redetermination should be the limit of our disposition and reversal is not appropriate at this juncture.

I concur in the result reached by the majority insofar as remand to and redetermination by the Commissioner is ordered, but dissent as to the direction of reversal and as to the basis of redetermination for the reasons herein expressed.

Justice HANEMAN joins in this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For remandment*—Justices HALL and HANEMAN—2.