173 N.J. Super. 268 (1980)
414 A.2d 259
BOARD OF EDUCATION OF THE TOWNSHIP OF BRANCHBURG, SOMERSET COUNTY, PETITIONER-APPELLANT,
v.
BOARD OF EDUCATION OF THE BOROUGH OF SOMERVILLE, SOMERSET COUNTY, RESPONDENT-RESPONDENT, AND BOROUGH OF SOMERVILLE, INTERVENOR.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1979.
Decided April 25, 1980.
*270 Before Judges SEIDMAN, MICHELS and DEVINE.
William B. Rosenberg argued the cause for appellant (Blumburg, Rosenberg, Mullen & Blumburg, attorneys).
Richard J. Murray argued the cause for respondent (Richard J. Murray and Thomas H. Dilts on the brief).
Thomas H. Dilts argued the cause for intervenor (Dilts & Kemp, attorneys; Thomas H. Dilts and Richard J. Murray on the brief).
John J. Degnan, Attorney General of New Jersey, filed a statement in lieu of brief on behalf of State Board of Education (Erminie L. Conley, Assistant Attorney General, of counsel; Mary Ann Burgess, Deputy Attorney General, on the statement).
The opinion of the court was delivered by SEIDMAN, P.J.A.D.
The Board of Education of the Township of Branchburg (Branchburg) appeals from the final decision of the State Board of Education (State Board) affirming the denial by the Commissioner of Education (Commissioner) of Branchburg's request to terminate the sending-receiving relationship with the Board of Education of the Borough of Somerville (Somerville).
For many years Branchburg has sent its high school students to Somerville under a sending-receiving relationship formalized in 1956 by a written agreement. Although the written agreement ended in 1965, the relationship continued pursuant to *271 N.J.S.A. 18A:38-13. Prior to the opening of its newly constructed high school in 1970, Somerville notified Branchburg that because of projected student enrollment the sending-receiving relationship should be terminated. At a meeting of both boards in September 1970 a target commencement date of 1975 was set for the phasing out of Branchburg students from Somerville. But in May 1971 Somerville informed Branchburg that it would be "mutually desirable" to reconsider the target date because "with total utilization of our new facility even with projected growth, we can continue to service the students of Branchburg and furnish fine education well beyond the original date of withdrawal."
Prior to May 1971 Branchburg had undertaken the planning of its own high school, purchasing a 76-acre tract for that purpose. However, a $5,210,000 bonding proposal to enable the construction of a high school with a capacity of 950 students was defeated by the Branchburg voters at a referendum held in December 1972. Branchburg subsequently commissioned various professional studies and formed several community groups, leading to recommendations in May 1975 that the contemplated high school was still Branchburg's best alternative. Although the high school remained in the planning stage and had not been approved by the Branchburg voters, Branchburg filed a petition with the Commissioner in September 1975 for severance of the sending-receiving relationship.
Testimony pro and con was presented to a hearing examiner on eight days between March 26 and June 15, 1976. The hearing examiner issued his report to the commissioner in February 1977. He concluded that "the `positive benefits' which would accrue if severance were granted are outweighed on balance by serious and compelling reasons of education and financial importance ...," and recommended that the petition be dismissed. The conclusion was based upon that which the hearing examiner considered to be the "primary facts" developed at the hearing: the present Somerville high school is a "good, perhaps *272 superior, school" offering a well-rounded educational program to all students; the present pupil population of about 1250 in Somerville is an "almost ideal number"; though "technically" overcrowded, the pupil population is managed well; the financial impact of severance on both school districts would be "of great significance"; severance would result in the necessity to maintain two small high schools with limited programs and reduced educational opportunities, and factors of racial imbalance were of "more than minimal significance."
After reviewing the report and considering the exceptions, objections and replies filed by Branchburg and Somerville, the Commissioner denied the application for severance. He viewed the controversy "as one with contested facts and disputed conclusion embracing a legal argument grounded on the passage of a comprehensive legislative enactment designed to insure a thorough and efficient educational program for all pupils." The question to be resolved was whether "such severance would be in the best interests of both the Branchburg and Somerville Boards in the joint desire of the Boards to provide an appropriate program of education for all of their high school pupils." He deemed a "key component" to be whether a "`breadth of program' mandated as necessary by the Public School Education Act could be maintained by the Board at a time subsequent to severance." He noted the hearing examiner's conclusion that it could not without increased expenditures and higher per pupil costs.
The Commissioner stressed the factor of school size, concluding that a student population below 800 was undesirable, and that this figure would not be reached in Branchburg (assuming a four-year high school) in the near future. While cognizant that "program articulation" would be enhanced for Branchburg pupils by severance, and that there was "no opportunity in such relationship for an effective representation in school affairs for the citizens of Branchburg ... an apparent contradiction *273 to the mandate of the Public School Education Act of 1975 ...," the Commissioner expressed the view that the matter was one for legislative review and change, not administrative action.
On further appeal to the State Board a majority of the Legal Committee believed that "[w]ith the Branchburg population steadily increasing, its application clearly has merit," and disputed the Commissioner's position that a high school with less than 800 students is undesirable. Invoking "the philosophy of the Public School Education Act that there should be `citizen involvement in educational matters,'" the majority recommended that the Commissioner's decision be reversed and the matter remanded for further proceedings, particularly: to obtain up-to-date student population data and projections for both municipalities, for an analysis of the possibility of regionalization, and, "in default of a voluntary agreement for regionalization," permitting Branchburg to sever the relationship upon satisfaction of "such reasonable conditions as may be imposed by the Commissioner...."
The minority of the Legal Committee stressed the racial considerations in recommending affirmance of the Commissioner's decision.
The State Board affirmed the Commissioner's action essentially for the reasons stated in his decision, though expressly disapproving of his position concerning the undesirability of a high school with fewer than 800 students. The State Board deemed "of the utmost importance" the effect severance would have on the racial composition of Somerville high school and the proposed Branchburg high school, stating that "[w]here we have a racially balanced school of high quality, we should preserve it unless other reasons for dismembering it are far stronger that [sic] they are here." Viewing with favor regionalization as a solution, the State Board directed the commissioner to "continue to explore the possibility with the parties."
On this appeal Branchburg contends that (1) there is "good and sufficient reason" to terminate the relationship because *274 Somerville high school is overcrowded, continuation of the relationship would be detrimental to the children of both communities, and Branchburg citizens are deprived of local involvement and community participation in their children's education; (2) regionalization is not a viable solution and (3) the benefits to students from termination of the relationship outweigh any detriment to Somerville and will not cause any significant educational, financial or racial impact that cannot otherwise be remedied.
A sending-receiving relationship between school districts may not be severed "except for good and sufficient reason upon application made to and approved by the commissioner, who shall make equitable determinations upon any such applications." N.J.S.A. 18A:38-13. Here, the administrative agency charged with making the determination determined that "good and sufficient reason" had not been shown for terminating the relationship between Branchburg and Somerville. That determination is entitled to a presumption of correctness and will not be upset unless there is an affirmative showing that the decision was arbitrary, capricious or unreasonable. The agency's factual determinations must be accepted if supported by substantial credible evidence. Thomas v. Morris Tp. Bd. of Ed., 89 N.J. Super. 327, 332 (App.Div. 1965), aff'd 46 N.J. 581 (1966); Quinlan v. North Bergen Tp. Bd. of Ed., 73 N.J. Super. 40, 46-47 (App.Div. 1962). We are satisfied from our thorough review of the record that the factual determinations of the hearing examiner, the Commissioner and the State Board in this case are amply so supported.
Branchburg concedes that a virtually all-white school would be created in Branchburg and that the percentage of non-white students in Somerville would increase from 10.8% to 18.2% if severance were permitted. But the argument is advanced by Branchburg that the effect would be minimal and significance is attached to its plan to provide space for a specified number of non-white Somerville students on a voluntary transfer plan. *275 We are not persuaded by these contentions in light of the strong state policy favoring racial balance in the public schools and the implementing authority vested in the Commissioner. See Jenkins v. Morris Tp. School Dist. and Bd. of Ed., 58 N.J. 483 (1971); Booker v. Plainfield Bd. of Ed., 45 N.J. 161 (1965). The evidence presented at the hearing clearly demonstrated that Branchburg's voluntary transfer plan would have little, if any, effect on its creation of an otherwise all-white high school. We shall not disturb the factfindings made and the conclusions reached on this issue by the Commissioner and the State Board.
As to Branchburg's further contention that the benefits of termination outweighed any detrimental financial impact, it was generally admitted at the hearing that a severance would result in increased educational costs to both districts, the only dispute being over the extent of the increase. Branchburg's witness predicted that school taxes in that district would increase 18.2%, 14.7% and 11.2%, respectively, in the first three years of operation of the proposed high school, and that Somerville's per pupil cost would rise 15% in the first year following termination. Somerville's school superintendent, however, predicted a 29% increase in that year and a 47% rise by 1980. Branchburg's own proofs would support the findings of fact of the Commissioner and the State Board. When Somerville's evidence is also considered, an even more compelling case was made for retaining the present relationship. It is further to be noted, in passing, that despite Branchburg's assurance of being "ready and willing to take on whatever financial consequences flow from termination of its sending-receiving relationship with Somerville," nowhere in the record is there any indication of a reasonable probability that the voters of Branchburg are now willing to assume the cost of the proposed new high school and the increase in educational expenses.
Branchburg stresses the fact that the student enrollment at Somerville exceeds its functional capacity and argues that overcrowding adversely affects the quality of education. But *276 Branchburg does not claim that the quality of education at Somerville is inferior. In fact, as the hearing examiner found from undisputed evidence, Somerville was "a good, perhaps superior school" which "offers a well-rounded educational program to all pupils." There is also substantial credible evidence in the record to support the finding that while the high school was technically overcrowded, such overcrowding was well-managed. In short, a severance of the sending-receiving relationship would, in our view, break up a well-run high school and produce two high schools of lesser quality.
Branchburg asserts that the legislative policy of encouraging local involvement and community participation in the educational process outweighs the racial, financial and educational objections to severing the relationship. However, we do not construe the legislative declaration in N.J.S.A. 18A:7A-2 to be a mandate that controls to the exclusion of all other factors. The Commissioner here was aware of the apparent contradiction between the policy declarations and the continuance of sending-receiving relationships in the absence of "good and sufficient reason" for termination, but he correctly weighed all the relevant factors in reaching his conclusion.
Finally, Branchburg argues at length that regionalization would not be a viable solution to the problem. However, the State Board recommended that the Commissioner continue to explore the possibility of regionalization and saw no need to "continue this litigation in the meantime." We agree. Until a full study has been completed the appropriateness of regionalization cannot be determined.
The final decision of the State Board is affirmed.